**11**

```
              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF INDIANA
                       FORT WAYNE DIVISION


SUPERIOR ALUMINUM          )
ALLOYS, LLC and            )
OMNISOURCE CORPORATION,    )
                           )
        Plaintiffs,        )
                           )
vs.                        ) No. 1:05-CV-00207-WCL
                           )
UNITED STATES FIRE         )
INSURANCE COMPANY, CRUM    )
& FORSTER HOLDING INC.,    )
SKY INSURANCE, INC.,       )
WILLIAM DEWEY and          )
COMPANY, and WILLIAM       )
DEWEY,                     )
                           )
        Defendants.        )


-----------------------------------------------------
DEPOSITION OF

WILLIAM J. WARFEL, Ph.D., CPCU, CLU

Taken on behalf of Plaintiffs



DATE:        November 15, 2006


TIME:        8:57 a.m.


LOCATION:    Barrett & McNagny, LLP
             215 East Berry Street
             Fort Wayne, Indiana  46802


BY:          Notice and Subpoena


REPORTER:    Thomas F. Rolf
```

1 knowledge of the requisites of insurability, what
2 constitutes an insurable exposure, my knowledge that,
3 as a general rule, substantial coverage cannot be
4 obtained for an exposure that--that does not meet
5 those requisites.
6      Q. Okay, well--and maybe I'm--maybe I'm
7 over-thinking this, but you say that Superior didn't
8 suffer a legal detriment as a matter of law, so I
9 guess I'm asking, what expertise, or maybe, I should
10 say, what basis you have for that particular opinion,
11 that Superior did not suffer a legal detriment as a
12 matter of law?
13      A. My knowledge of the requisites of
14 insurability.
15      Q. Okay, is that it?
16      A. In other words, they didn't suffer a
17 legal detriment because coverage could not have been
18 obtained for this sort of loss, assuming that the
19 cause of the loss was wear-and-tear and/or defective
20 workmanship, that that coverage cannot be obtained in
21 the marketplace.
22      Q. Okay, well let's go to that, then, what
23 is the basis for that opinion or comment that you
24 just made? What is the factual basis for your
25 opinion that the coverage you just described cannot

1    A.   As I recall, a great deal of his opinion
2 touches on the issue concerning special relationship.
3 And, again, I wasn't asked to evaluate whether or not
4 there was a special relationship. So, I would have
5 no opinion, in terms of his opinions, concerning the
6 issue of special relationship.
7    Q.   Okay, do you have any opinions regarding
8 anything else that he has stated in his report?
9    A.   Certainly, I would agree with him, in
10 terms of the general responsibilities and duties of
11 an insurance broker.
12   Q.   Okay, anything else that you disagree
13 with?
14   A.   I disagree with point number three. It
15 says--this would--there's not a--page number six,
16 point number three says, "Sky Insurance was negligent
17 when asserting that replacement policies from U.S.
18 Fire would provide coverage for runout as the
19 previous Zurich policy provided." In fact, the
20 policies were identical. Both policies contained the
21 wear-and-tear exclusion and the poor workmanship or
22 design exclusion. So, that given that the coverages
23 were the same, there wasn't any negligence on the
24 part of Sky Insurance in asserting that there was
25 coverage for "Runout." Again, I think they were

1 reasonable in assuming that the policyholder knows
2 that any insurance policy is circumscribed with
3 exclusions.  So, I would take issue with number
4 three.  I think issue number four, I think they did
5 meet their duty and responsibility, in terms of the
6 procurement of insurance.  The coverage that was
7 procured was identical to the coverage that had been
8 provided by Zurich.  So, I would take issue with
9 contention number four.
10          Q.  Well, I think--I don't mean to interrupt
11 you, but it may be more efficient for this deposition
12 if I interject and we talk about each one, one by
13 one.
14          A.  All right.  Okay.
15          Q.  The first one that you took issue with
16 was number three.  Now, I suppose we may disagree
17 about what number three says or means, but I can
18 represent to you that I have spoke to Mr. Deimling
19 about his report, and what I believe he means by that
20 contention there, is that the actual assertion, the
21 stating by Sky Insurance, namely, Mr. Fether, to my
22 clients that the U.S. Fire would provide coverage for
23 runout, just like the Zurich policy did, that
24 statement--the affirmative statement was negligent on
25 his part.  And I couldn't tell from your answer

1        A.   That's correct.

2        Q.   You've reviewed the complaint in this

3 matter, have you not?

4        A.   Correct.

5        Q.   Do you recall in the complaint that the

6 plaintiffs contend that Sky effected a change in

7 insurance coverage that the plaintiffs did not

8 authorize?

9        A.   I believe that's one of the allegations.

10       Q.   And so is that yet another theory that's

11 being asserted by the plaintiffs against--

12       A.   Yes, it is.

13       Q.   And I believe in your report you address

14 that particular theory being asserted against Sky?

15       A.   That's correct.

16       Q.   And your opinion on that issue was?

17       A.   My opinion was that the policies that

18 were obtained before the loss that brings us here

19 today were identical to the policy that was

20 applicable at the time of the loss, that the policies

21 that were obtained subsequent to the loss are

22 identical to the policy that was applicable at the

23 time of the loss, and so that there wasn't any breach

24 in that respect.

25       Q.   You were also asked earlier whether the

1       Q.  Commercial property insurance forms?

2       A.  Yes, I do.

3       Q.  And is it fair to say that insurance
4  policies, as a general matter, are a compilation of
5  fairly standard forms that are put together to
6  address specific risks?

7           MR. BOBILYA:  Objection, lack of
8  foundation.

9       A.  That's correct.

10      Q.  Have you ever personally seen a property
11 and casualty insurance coverage policy or form that
12 does not include a wear-and-tear exclusion or a
13 design defect/faulty workmanship exclusion?

14      A.  No, I have not.

15      Q.  Are you aware of any insurer who offers a
16 form like that for sale?

17      A.  No.

18      Q.  You've reviewed Mr. Deimling's report,
19 have you not?

20      A.  Yes, I have.

21      Q.  Did he identify any particular insurer
22 from which that coverage could be obtained?

23      A.  No.

24      Q.  Did he identify any particular coverage
25 form that's available in the market?

```
 1        A.   No.

 2        Q.   With respect to Mr. Deimling's report,
 3   you were asked to go through that and articulate
 4   areas where you disagree--
 5             MR. JONES:  I don't think we marked this,
 6   did we?
 7             MR. BOBILYA:  What is it?
 8             MR. JONES:  The Deimling report.
 9             MR. BOBILYA:  No, we didn't.
10             MR. JONES:  Why don't we go ahead and
11   mark it?
12        Q.   The Deimling report is now marked as
13   Exhibit 118
14        A.   I have a copy of it.  I've got a copy of
15   it.
16        Q.   Let me direct your attention--beginning
17   on the bottom of page three of his report it states,
18   "By not understanding the U.S. Fire's claims
19   approach, or the potential loss exclusions and
20   limitations contained in the standard forms coverage,
21   Fether deprived OmniSource of the opportunity to plan
22   for an uninsured event, and the financial impact
23   which would follow.  Armed with the information that
24   a denial or an excluded loss was probable, OmniSource
25   could have," and then there are four options in his
```

1  report for things that OmniSource could have done, do
2  you see where I'm indicating?
3          A.   Yes, I do.
4          Q.   Number one, "Sought coverage elsewhere,"
5  was that a viable, realistic option for Sky or Bill
6  Fether?
7          A.   No.
8          Q.   Why not?
9          A.   Because those exclusions are universally
10 included in property insurance policies.
11         Q.   How about number two, "Offered to pay
12 additional premium to U.S. Fire to provide the
13 specific coverage desired," was that a viable
14 alternative for Sky or Mr. Fether?
15         A.   No.
16         Q.   Why not?
17         A.   Generally, coverage for uninsurable
18 exposures is not offered for any premium.
19         Q.   And you gave some testimony earlier about
20 premium potentially being cost prohibitive, do you
21 recall that?
22         A.   That is correct.
23         Q.   As a general rule, taking into
24 consideration general risk management principles, is
25 it fair to say that a policyholder would not buy

1 coverage that would cost it the same amount as the
2 potential loss that they want to insure?
3      A.   That's correct.
4      Q.   Is that an example of what you mean by
5 the premium being cost prohibitive?
6      A.   Yes, it is.
7      Q.   So, it's not necessarily an issue of
8 whether or not the policyholder has the financial
9 wherewithal to pay, it's whether or not it makes any
10 financial sense to do it?
11      A.   That's absolutely correct.  Insurance
12 normally is only used where the premium is small,
13 relative to the potential loss.  That's a basic risk
14 management principle.
15      Q.   And so there is a threshold, presumably,
16 where a reasonable policyholder will not pay a
17 premium to cover a particular loss?
18      A.   That's correct, irrespective of the
19 financial resources of the policyholder.
20      Q.   Number three in Mr. Deimling's report set
21 a funding mechanism to ease any loss that might
22 occur, do you have any idea of what type of funding
23 mechanism he's talking about there?
24      A.   That is a reference to self-insurance in
25 which the loss would be funded in advance of the

1 occurrence of the loss.

2     Q.   And you spoke about that earlier, that
3 that merely alters the timing of when you pay, rather
4 than whether you pay, correct?

5     A.   That is correct.

6     Q.   And I think that covers number four in
7 his report.  So, is it fair to say, then, that this
8 is not an area where you articulated any disagreement
9 with Mr. Deimling, is it fair to say looking back at
10 this, that this is another area where you disagreed
11 with his conclusions in his report?

12    A.   That is correct.

13    Q.   You were asked questions earlier about
14 Jennifer Wilson and her responsibilities for
15 purchasing insurance on behalf of the plaintiffs, do
16 you remember that?

17    A.   Yes, I do.

18    Q.   From reviewing--you reviewed her
19 deposition transcript, did you not?

20    A.   That is correct.

21    Q.   And she articulates in there what her
22 responsibilities were with respect to the purchase of
23 insurance for the plaintiff organizations?

24    A.   That's correct.

25    Q.   Was there also testimony on that issue in