**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| **SUPERIOR ALUMINUM ALLOYS, LLC,** ) | |
| **and OMNISOURCE CORPORATION,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **CAUSE NO. 1:05-CV-207** |
| ) | |
| **UNITED STATES FIRE INSURANCE** ) | |
| **COMPANY, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**OPINION AND ORDER**

**I. INTRODUCTION**

Plaintiffs Superior Aluminum Alloys, LLC, and its parent company, OmniSource

Corporation (collectively, "Superior"), operate an aluminum melting plant in New Haven,

Indiana. (Compl. ¶¶ 2, 13, 19.)  On March 25, 2004, Superior experienced a sudden and

unexpected run-out of molten aluminum from one of its furnaces, causing severe damage to the

furnace and Superior's surrounding property. (*Id*. ¶ 20.)  Superior's insurance claim for the

incident, however, was denied. (*Id*. ¶ 26.)

Consequently, Superior brought this suit against its insurer, Defendant United States Fire

Insurance Company ("U.S. Fire"), and U.S. Fire's parent company, Crum & Forster Holding,

Inc. ("Crum & Forster"), alleging that they breached U.S. Fire's insurance policy with Superior

by failing to cover its claim. (*Id*. ¶¶ 4, 14, 24, 27.)  Superior also named its insurance agent, Sky

Insurance, Inc. ("Sky"), as a Defendant, alleging that Sky was negligent when it procured an

insurance policy for Superior that failed to cover damages arising from a furnace run-out.[1] (*Id*. ¶¶ 5, 15-16, 37.)

Superior now seeks to preclude or limit the testimony of U.S. Fire's proffered expert witness, Robert S. Carbonara, Ph.D.[2] (Docket # 74.)  For the reasons provided, Superior's motion will be DENIED.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Superior is engaged in the business of acquiring scrap aluminum, melting it, and selling the refined aluminum to customers who use it to manufacture various products, particularly products for use in the automotive industry. (Compl. ¶ 19; Mem. of Law in Supp. of Pls.' Mot. to Preclude or Limit the Test. of Robert Carbonara ("Pls.' Mem. in Supp.") at 1.)  Superior melts its scrap aluminum in large steel furnaces, one of which is the furnace giving rise to this controversy – Furnace No. 3. (Aff. of Carl Kelley ¶¶ 10-12; Compl. ¶¶ 19-20.)

On March 25, 2004, Furnace No. 3 experienced what is referred to in the industry as a "run-out" or "bleed-out." (Compl. ¶ 20.)  In essence, the shell of the furnace was compromised and the contents, molten aluminum metal, spilled out, ruining the furnace. (Pls.' Mem. in Supp. at 2.)

Consequently, on June 23, 2004, Superior made a claim for damages under its property and casualty insurance policy issued by its insurer, U.S. Fire. (Compl. ¶ 25, Exs. A-B.)  U.S. Fire

---

[1] Accordingly, diversity jurisdiction arises under 28 U.S.C. § 1332(a).  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

[2] Likewise, U.S. Fire, Crum & Forster, and Sky have moved to bar Superior's designated expert witness, Greg Deimling (Docket # 72, 77), and U.S. Fire and Crum & Forster have moved to strike the affidavit of another expert witness proffered by Superior, Dr. Kenneth Sandhage, and Superior's designation of Sandhage as an expert witness (Docket # 100).  These motions are addressed by the Court in separate, contemporaneously-entered orders.

then retained the services of Carbonara, its proffered expert, to investigate the circumstances surrounding Superior's run-out. (Aff. of Dr. Robert S. Carbonara ¶ 4.)

Carbonara is a senior analyst with SEA, Ltd., where he is responsible for general failure analysis and the testing, evaluation, and forensic analysis of metals, glass, ceramic, and polymeric materials. (*Id.* ¶¶ 16-17, Ex. A.)  Carbonara states that during his time with SEA he has worked on approximately two thousand failure analysis projects, including three furnace run-outs and approximately twenty-four projects that involved ceramics. (*Id.* ¶¶ 16, 17, 19.)  Prior to his nineteen-year tenure with SEA, Carbonara worked for twenty years at Battelle Memorial Institute where he was responsible for testing, analyzing, and measuring the properties of high temperature material compounds in high temperature applications, utilizing a specialized furnace with ceramics. (*Id.* ¶ 13.)  Prior to his time with Battelle, Carbonara worked for over ten years in various positions involving materials science, scientific research, and testing and analysis. (*Id.* ¶¶ 12-17, Ex. A.)

As to his education, Carbonara has a bachelor's degree in physics, has performed graduated studies in both physics and metallurgy, and has a doctoral degree in materials science. (*Id.* ¶¶ 8-9, Ex. A.)  He also has served as an invited lecturer for various courses, has obtained a patent for certain methodology, and has published a plethora of papers in his field. (*Id.* ¶¶ 18, 21, Ex. A.)  To date, Carbonara has testified in approximately thirty court cases as an expert witness in material science and failure analysis. (*Id.* ¶ 20.)

Carbonara first visited Superior's New Haven plant on May 5, 2004, six weeks after the run-out occurred. (Dep. of Robert S. Carbonara, Ph.D. at 59, 69-70.)  During his visit, he inspected the furnace, took photographs, and talked with key Superior employees. (*Id.*)  One

week later, he issued a letter to U.S. Fire's claim adjuster in which he concluded that the run-out was caused by "normal deterioration resulting from the extreme condition that exists in this furnace during normal operations." (Pls.' Mem. in Supp. Tab 2.)  On June 29, 2004, U.S. Fire denied Superior's claim for damages from the run-out, citing a provision of the policy that excludes coverage for losses caused by "wear and tear." (Compl. Ex. C.)

After further investigation, Carbonara issued an expert report on September 28, 2006, and an addendum to that report on January 4, 2007. (Pls.' Mem. in Supp. Tab 6; Defs.' Resp. to Pls.' Mot. to Preclude or Limit the Test. of Dr. Robert Carbonara ("Defs.' Resp.") Tab 4.)  In his report, Carbonara concluded that the run-out was caused by "a loss of integrity of the furnace refractory lining" and that the "loss of integrity was the result of deterioration of the refractory bricks." (Defs.' Resp. Tab 4.)  He explained that the "deteriorated bricks allowed cracks to form" and that the "cracks allowed molten aluminum to penetrate the refractory lining to the extent that a run-out occurred." (Pls.' Mem. in Supp. Tab 6.)

### III.  APPLICABLE LAW

The admissibility of expert evidence is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

> *Daubert* requires a district court to exercise a "gatekeeping" function to ensure that

expert testimony is both reliable and relevant pursuant to Rule 702. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *see generally Daubert*, 509 U.S. at 589-92; *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006); *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003). This inquiry applies not only to scientific testimony, "but to all kinds of expert testimony." *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002) (noting that Rule 702 "makes no distinction between 'scientific' knowledge and other forms of specialized knowledge" (citing *Kumho Tire*, 526 U.S. at 149)).  The fundamental purpose of the gate keeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

According to the Seventh Circuit Court of Appeals, to gauge reliability, "the court is to determine whether the expert is qualified in the relevant field and . . . examine the methodology the expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  "The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence." *Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 921 (N.D. Ind. 2006); *see also Bradley v. Brown*, 852 F. Supp. 690, 698 (N.D. Ind. 1994), *aff'd*, 42 F.3d 434 (7th Cir. 1994).

When determining whether an expert is qualified to render an opinion, the court should consider his "full range of practical experience as well as academic or technical training . . . ." *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (quoting *Smith*, 215 F.3d at 718). Nevertheless, "[a] court's reliability analysis does not end with its conclusion that an expert is

qualified to testify about a given matter . . . . [T]he court's gatekeeping function [also] focuses on an examination of the expert's methodology." *Smith*, 215 F.3d at 718.  Accordingly, "[an] expert['s] work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data.  Talking off the cuff–deploying neither data nor analysis–is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

Specifically, *Daubert* outlined the following factors to guide district courts in assessing an expert's methodology:

> (1) whether a theory or technique . . . can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique or method has met with general acceptance.

*Conn*, 297 F.3d at 555 (quoting *Daubert*, 509 U.S. at 593-94) (internal quotations omitted).  "[A]lthough the fundamental task of the trial court remains the same no matter what sort of specialized information is proffered, the *Daubert* factors set forth above ought not be considered a definitive check list suitable for the evaluation of all kinds of evidentiary submissions involving specialized knowledge." *Id.* at 555-56.  Indeed, this list is "neither definitive nor exhaustive, but rather flexible to account for the various types of potentially appropriate expert testimony." *Deputy*, 345 F.3d at 505.  "Using the *Daubert* factors as a point of departure, the district court is free to fashion an approach more precisely tailored to an evaluation of the particular evidentiary submission before it." *Conn*, 297 F.3d at 556.

But even if an expert's testimony is deemed reliable, it must be excluded if it is not relevant, which means under Rule 702 that it is not likely "to assist the trier of fact to understand the evidence or determine a fact in issue . . . ." *United States v. Hall*, 93 F.3d 1337, 1342 (7th

Cir. 1996); *see also Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000); *Smith*, 215 F.3d at 718.  Stated another way, "the suggested . . . testimony must 'fit' the issue to which the expert is testifying." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (quoting *Porter v. Whitehall Labs. Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)).

Moreover, when determining whether an expert's testimony is admissible, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (citing *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997)).  As the Supreme Court wrote: "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146.  Stated another way, an expert "who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elec. Corp. v. WH-T Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *see also Mamah*, 332 F.3d at 478 ("The court is not obligated to admit testimony just because it is given by an expert.").  Indeed, the Seventh Circuit has consistently held that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zenith Elec. Corp.*, 395 F.3d at 419-20 (collecting cases).

## IV.  DISCUSSION

Superior requests that the Court bar Carbonara from testifying as an expert witness for U.S. Fire, asserting that he "is not qualified as an expert in the field of aluminum melting furnaces or refractory bricks because he has no education or training and very little experience in these fields." (Pls.' Mem. in Supp. at 1.)  Superior also contends that Carbonara's opinions

concerning Furnace No. 3 are "unreliable because they are not supported by sound methodology or reliable data." (*Id*.)

### A.  *Carbonara Is Sufficiently Qualified*

Superior first argues that Carbonara is not qualified to render opinions regarding an aluminum melting furnace, contending that he has not worked in the aluminum melting industry in any capacity and that he "has no education or training specifically regarding aluminum melting furnaces." (*Id*. at 6.)  Superior perceives that many of Carbonara's opinions are based upon the manner in which Furnace No. 3 was operated and maintained, and it asserts that he "simply has no basis for any opinion pertaining to the maintenance or repair of the furnace" because the "only limited experience Carbonara has with aluminum melting furnaces comes from his work as a purported expert in three other run-out cases." (*Id*. at 6-7.)  Superior explains that an aluminum melting furnace is a relatively complex piece of equipment that is regulated by the Environmental Protection Agency and the Occupational Safety and Health Administration, requires a federal permit to operate, necessitates compliance with comprehensive maintenance and safety requirements, and requires a great deal of precision, skill, and training to operate. (Kelley Aff. ¶¶ 10-15.)

Superior also asserts that Carbonara is not qualified to render expert opinions regarding the refractory bricks used in Furnace No. 3, which are a type of ceramic material specifically manufactured and designed for use in aluminum melting furnaces. (*Id*. ¶ 20-22.)  It contends that Carbonara "has very little education or experience in the field of ceramics or refractory bricks," as he could only recall a college course that he took over thirty-five years ago that included a section on ceramics, he does not hold a degree in ceramics, and he has not taken any classes

8

dealing exclusively with ceramics. (Pls.' Mem. in Supp. at 8.)  Superior emphasizes that

Carbonara's only work experience related to ceramics is his incidental use at Battelle Memorial

Institute of "induction furnaces," which may have been lined with ceramics but were used to

conduct experiments on things *other* than ceramics. (*Id.* at 8-9.)  In sum, Superior contends that

Carbonara's studies of material science and his years of work as an expert witness in cases

ranging from those involving "fingernail polish bottles to railroad cars" do not make him an

expert in aluminum melting furnaces, ceramics, and refractory bricks. (*Id.*; Carbonara Dep. at

24-25.)

  Superior's attack on Carbonara's qualifications, however, is unconvincing.  "The

requirement that an expert be qualified by knowledge, skill, experience, education or training

should not be viewed as being particularly rigorous." *Traharne v. Wayne/Scott Fetzer Co.*, 156

F. Supp. 2d 697, 706 (N.D. Ill. 2001); *see also Menges v. Depuy Motech, Inc.*, 61 F. Supp. 2d

817, 825 (N.D. Ind. 1999).  "A witness may qualify as an expert even if the opposing counsel

can point to deficiencies in his or her qualifications." *Traherne*, 156 F. Supp. 2d at 706.

Furthermore, "[o]nce a witness passes the threshold of knowledge, skill, experience, training, or

education to qualify as an expert, any shortcomings or deficiencies which he or she possesses are

reserved for cross-examination." *Id.*; *see also Bourke v. Ford Motor Co.*, No. 2:03-CV-136, 2006

WL 3833324, at *2 (N.D. Ind. 2006).

  Here, Carbonara has degrees in physics, metallurgy, and materials science.  As part of his

graduate studies in metallurgy, Carbonara learned about all types of furnaces that heat metals,

and during his doctoral studies in materials science, he studied the behavior of all types of

materials, including ceramics. (Carbonara Aff. ¶ 8.)  Furthermore, Carbonara has decades of

9

experience in testing and evaluating all types of materials, including ceramics and bricks, in a variety of applications, including furnaces. (*Id*. ¶¶ 13-17, Ex. A.)  During his twenty-year tenure with Battelle Memorial Institute as a scientist and a manager, Carbonara was involved in projects relating to high temperature thermodynamic properties. (*Id*.)  In particular, Carbonara was responsible for testing, analyzing, and measuring the properties of high temperature compounds in high temperature applications, with temperatures in excess of the melting point of steel. (*Id*.) During these projects, testing was done in specialized furnaces utilizing ceramics. (*Id*.)

Carbonara also has extensive experience in failure analysis, having conducted failure analysis evaluations in approximately two thousand other projects during his nineteen-year tenure with SEA, Ltd., including three aluminum furnace run-outs. (*Id*. ¶ 19.)  While at SEA, he also has been involved with materials testing and analysis, including the testing and analysis of metals, glass, ceramics, and polymeric materials; specifically, Carbonara has been involved with approximately twenty-four projects involving ceramics. (*Id*. ¶ 16.)  Clearly, Carbonara has significant knowledge and experience regarding furnaces and ceramics.

Even assuming that Carbonara does not have *extensive* experience with aluminum melting furnaces or a *specific* education in ceramics, Carbonara is still qualified to render his opinions.  District courts in the Seventh Circuit have qualified witnesses as experts even though they did not specialize or have experience in the particular product or field involved in the case. *See, e.g.*, *Maguire v. Nat'l R.R. Passenger Corp*., No. 99 C 3240, 2002 WL 472275, at *3 (N.D. Ill. March 28, 2002) (concluding in a case pertaining to premises security in the railroad industry that the qualifications of a proffered premises security expert were not inadequate though he had no experience in the railroad industry); *Lichter v. Case Corp*., No. 99 C 4260, 2001 WL 290615,

10

at *2 (N.D. Ill. March 20, 2001) (determining in a case involving the design and safety of skid loaders that an expert who had degrees in mechanical engineering was qualified to testify though he did not have extensive experience pertaining to skid loaders); *McCloud ex rel. Hall v. Goodyear Dunlop Tires N. Am., Ltd.*, 479 F. Supp. 2d 882, 887-90 (C.D. Ill. 2007) (permitting an expert in rubber polymers and tire mechanics to testify in a case pertaining to motorcycle tires though he had only limited experience with the manufacture of motorcycle tires).  Furthermore, an expert witness need not be qualified to testify to the ultimate issue in the case provided that he can lend some assistance to the jury with regard to *any* factual matter. *Smith*, 215 F.3d at 721; *Maguire*, 2002 WL 472275, at *3.

Rather, Superior's criticisms of Carbonara's credentials go to the weight of his testimony, not its admissibility. *Lichter*, 2001 WL 290615, at *2; *Owens v. Amtrol, Inc*., 94 F. Supp. 2d 952, 955 (N.D. Ind. 2000).  "*Daubert* . . . teach[es] that the anodyne for shaky testimony is not exclusion but cross-examination." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc*., 372 F. Supp. 2d 1104, 1114 (N.D. Ill. 2005); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Allstate Ins. Co. v. Maytag Corp*., No. 98 C 1462, 1999 WL 203349, at *3 (N.D. Ill. March 30, 1999) ("Questions about the qualifications of an expert witness should be considered in assessing the credibility and weight of the opinions offered, and should not serve to exclude them altogether.").

The Court is satisfied that Carbonara is adequately qualified to offer an expert opinion with respect to the circumstances and causation of the run-out. *See generally United States v. Stevenson*, 6 F.3d 1262, 1267 (7th Cir. 1993) ("A court has wide discretion in determining the

11

competency of a witness as an expert and the relevancy of his testimony with respect to a particular subject."); *Richman v. Sheahan*, 415 F. Supp. 2d 929, 943 (N.D. Ill. 2006) ("Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility.").

### B.  Carbonara's Opinions Are Sufficiently Reliable

In a nutshell, Carbonara's opinion is that the refractory bricks in Furnace No. 3 deteriorated over time and that the chemical reactions between the molten aluminum and the refractory bricks caused the bricks to expand.  He opines that this deterioration and expansion eventually caused the bricks to crack or lose their integrity, which ultimately led to the run-out. Superior, however, contends that Carbonara has no reliable basis for his opinion that the expansion of the bricks caused the run-out.

Superior makes four arguments in support of its claim that Carbonara's opinions are unreliable: (1) Carbonara's "entire theory" for the cause of the run-out is based on his inspection and measurement of the bricks in September 2006, but he cannot rely on these bricks because they were jack-hammered, fractured, and exposed to the outdoors; (2) the chemical reactions would "more likely" have resulted in a decrease in the volume of the bricks, rather than an increase; (3) there is no support for Carbonara's opinion that the bricks deteriorated; and (4) Carbonara did not consider that the furnace was designed to withstand movement of the floor and walls. (Pls.' Mem. in Supp. at 11-19.)  Superior's contentions, while perhaps a basis for cross-examination, do not lead to the conclusion that Carbonara should be precluded from testifying.

1.  Carbonara's September 2006 Inspection and Measurement of the Bricks

As Superior's first argument goes, Carbonara's "entire theory in this case" is based on his September 2006 inspection and measurements of bricks salvaged from Furnace No. 3. (*Id*. at 13.) Superior contends that Carbonara's analysis of these bricks is not reliable, however, because he waited until thirty months *after* the run-out to examine the bricks, after they had been jackhammered, chiseled, fragmented, and exposed to the elements.

To elaborate, Superior states that after the run-out it removed the failed bricks from Furnace No. 3 in order to make some interim repairs to the furnace's floor. (Kelley Aff. ¶¶ 24-26.)  It explains that the bricks located at the specific point where the furnace floor failed had already broken into pieces and were chipped, corroded, and partially dissolved; thus, Superior simply raked them out of the failure site. (*Id*. ¶¶ 27-29.)  Superior also removed the bricks immediately surrounding the failure site, which were still bonded together by mortar, using a large, machine-mounted, hydraulic jackhammer to break and loosen the refractory bricks and the sub-floor of the furnace. (*Id*. ¶¶ 30-33.)  Furthermore, it reports that bonded bricks had to be chiseled out of the furnace floor in chunks or fragments in order to remove them. (*Id*. ¶ 33.)  Superior explains that this process severely fractured most of the bricks that were removed. (*Id*. ¶ 34.)  As the bricks were removed, they were stacked on carts near the furnace and stored outdoors in early April 2004 in order to make room for Superior and its contractors to work near the furnace. (*Id*. ¶ 35-38.)  In late May 2004, Superior placed the removed bricks in plastic buckets and moved them indoors, saving them for future inspection. (*Id*. ¶ 42.)

Carbonara examined the bricks on September 11, 2006, thirty months after the run-out. (Pls.' Mem. in Supp. Tab 6.)  Consequently, Superior asserts that Carbonara's measurements of

the bricks are "meaningless," because the bricks he examined were jackhammered, chiseled, and crumbled, were temporarily stored outdoors, and were not a representative sample of the bricks that were in the furnace floor *prior to* the run-out. (*Id.* at 14.)  As Superior sees it, Carbonara cannot accurately opine about the size of the bricks *before* the run-out by relying on measurements of partial, fragmented bricks procured *after* the run-out. (*Id.*)  It additionally emphasizes that Carbonara failed to consider the possibility that the bricks could have swollen after the run-out but before he inspected them in September 2006, particularly since they were sprayed with water and stored outdoors for a time. (*Id.*)

Contrary to Superior's perspective, Carbonara's theory as to the cause of the run-out does not rest solely on his inspection and measurement of the bricks in September 2006.  Rather, Carbonara also utilized other methodology to reach his opinion. *See generally Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000) (articulating that "experts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion").

Specifically, Carbonara inspected and took photographs of Furnace No. 3 on May 5, 2004. (Carbonara Dep. at 70.)  "Personal observation is deemed often to be the most reliable source of information." *Loeffel Steel Prods.*, 372 F. Supp. 2d at 1116 (citing *Daubert*, 509 U.S. at 590 n.9).  He also interviewed Superior's key employees and reviewed Superior's records relating to the maintenance and repairs of Furnace No. 3. (Carbonara Dep. at 70; Pls.' Mem. in Supp. Tab 6; Defs.' Resp. Tab 4.)  "Review of reports and records is an appropriate method for experts to learn the data about which they plan to testify." *Weir v. Crown Equip. Corp.*, 217 F.3d 453, 465 (7th Cir. 2000).

In addition, Carbonara reviewed reports relating to infrared tests that were performed on Furnace No. 3 prior to the run-out, and he also reviewed and relied upon the June 2, 2005, report of Dr. Kenneth Sandhage, who was retained by Superior to evaluate the ceramic refractory lining of Furnace No. 3, together with Sandhage's supporting documents and photographs.[3] (Carbonara Dep. at 212-13, 220; Pls.' Mem. in Supp. Tab 6; Defs.' Resp. Tab 4.)  In his report, Sandhage analyzed the extent to which the molten aluminum penetrated the bricks recovered from Furnace No. 3. (Pls.' Mem. in Supp. Tab 8.)  "[R]eview of . . . scientific data generated by others in the field may suffice as a reasonable methodology upon which to base an opinion." *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999) (internal quotation marks omitted); *see also Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996).  Thus, his September 2006 inspection and measurement of the bricks is but a *portion* of the evidence Carbonara used to form his opinion as to the cause of the run-out.

Furthermore, though neither party discusses any "known or potential rate of error" or whether Carbonara's method of inspection and measurement of the bricks enjoys "general acceptance" within a "relevant scientific community," *Daubert*, 509 U.S. at 594, many of the bricks Carbonara examined in September 2006 were the *same* bricks that Sandhage examined in the fall of 2004 before he prepared his June 2005 report.  Thus, the bricks were already jackhammered, chiseled, fractured, and exposed to the elements before Sandhage examined

---

[3] Superior failed to designate Sandhage as an expert by its deadline for the disclosure of expert witnesses; consequently, U.S. Fire and Crum & Forster moved to strike Sandhage's Affidavit and Superior's designation of Sandhage as an expert witness.  Their motion, which as explained *supra* is addressed by the Court in a separate Opinion and Order, is ultimately successful; thus, Sandhage's Affidavit was not considered by the Court when ruling on the instant motion.  However, as explained in the separate Opinion and Order addressing the motion, Sandhage's June 2, 2005, report survives for purposes of Carbonara's opinion.

them, suggesting that Carbonara's technique was not unreasonable within the relevant scientific community. *Id*. at 594; *see generally Kumho Tire Co.*, 526 U.S. at 141 (articulating that while a trial court may consider one or more of the specific factors mentioned in *Daubert*, the law grants it "broad latitude" in deciding how to determine reliability).

In sum, contrary to Superior's assertion, Carbonara employed a variety of sources in developing his expert opinion concerning the run-out. *See Cooper*, 211 F.3d at 1020.  Thus, Superior's assertion that Carbonara's "entire theory in this case" rests on his September 2006 inspection and measurement of the bricks is without merit.

### 2. Carbonara's Opinion That the Bricks Increased in Volume

Next, Superior asserts that Carbonara's opinion that the refractory bricks increased in volume is not reliable because he did not perform a test or experiment on the bricks to determine the chemical reactions that took place. (Pls.' Mem. in Supp. at 15.)  Superior contends that if he had completed such testing, he would have found that his conclusion was incorrect, arguing that the chemical reactions would have resulted in a *decrease* in volume, not an *increase*. (*Id*.)

Contrary to Superior's argument, "the mere fact that no testing was done is not an automatic bar to the admissibility of an expert opinion.  The Seventh Circuit Court of Appeals has stated that while testing is often important . . . testing is not 'an absolute prerequisite to the admissibility of expert testimony.'" *Allstate Ins. Co.*, 1999 WL 203349, at *4 (quoting *Cummins*, 93 F.3d at 369).  The key inquiry is whether the expert witness "adhere[s] to the same standards of intellectual rigor that are demanded in their professional work." *Cummins*, 93 F.3d at 369. "This objective can be accomplished in a number of different ways, including through the review of experimental, statistical, or other scientific data generated by others in the field." *Id*.

16

Here, Carbonara explains that he did not need to complete testing because he already knows the chemical reactions that take place when bricks come into contact with molten aluminum, aluminum additives, and alloy additives in a high temperature environment, due to his knowledge in the areas of physics, chemistry, material science, and metallurgy, and his experience in testing and analyzing high temperature materials in high temperature applications. (Carbonara Aff. ¶ 27.)  "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience." *Loeffel Steel Prods.*, 372 F. Supp. 2d at 1116 (quoting *Kumho Tire*, 526 U.S. at 148).

Carbonara states that his visual inspection and measurement of the bricks then confirmed his knowledge of the chemical reactions that took place. (Carbonara Aff. ¶ 28.)  "[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire*, 526 U.S. at 156; *Loeffel Steel Prods.*, 372 F. Supp. 2d at 1116; *Allstate Ins.*, 1999 WL 203349, at *5.

Moreover, in reaching his conclusion that the bricks expanded, Carbonara also considered and relied upon the data in Sandhage's report, who evaluated the chemical composition of the bricks, together with Sandhage's supporting documents and photographs.  As stated *supra*, "review of experimental, statistical, or other scientific data generated by others in the field may suffice as a reasonable methodology upon which to base an opinion." *Clark*, 192 F.3d at 758 (internal quotation marks omitted); *see Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 743 (N.D. Ill. 2005) ("[T]he process of analyzing assembled data while using experience to interpret the data is not illicit; an expert need not actively conduct his or her own tests to have a valid methodology.").  Though Superior attacks Carbonara's conclusion regarding the volume of

17

the bricks, the focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate. *Chapman*, 297 F.3d at 687.

Consequently, Superior's criticisms regarding Carbonara's lack of testing do not, in this Court's view, render Carbonara's opinions inadmissible.

3. Carbonara's Conclusion That the Purported
Cracking of the Bricks Was Caused by Deterioration

Third, Superior contends that there is no basis for Carbonara to conclude that the purported cracking of the bricks was caused by deterioration, asserting that he "did not conduct a single test, study, or calculation to evaluate the extent of the alleged deterioration in the refractory bricks." (Pls.' Mem. in Supp. at 15.)  Again, Superior's argument is less than convincing.

To reiterate, the performance of hands-on testing is not an absolute prerequisite to the admissibility of an expert opinion. *Cummins*, 93 F.3d at 369; *see Henderson v. Freightliner, LLC*, No. 1:02-CV-01301DFH-WTL, 2005 WL 775929, at *16-17 (S.D. Ind. March 24, 2005). As stated in *Daubert*, "the test of reliability is 'flexible.'" *Kumho Tire Co.*, 526 U.S. at 141.  The objective of ensuring intellectual rigor "can be accomplished in a number of different ways, including through the review of experimental, statistical, or other scientific data generated by others in the field." *Rogers v. Ford Motor Co.*, 952 F. Supp. 606, 615 (N.D. Ind. 1997) (quoting *Cummins*, 93 F.3d at 369); *see generally Dewick v. Maytag Corp.*, 324 F. Supp. 2d 894, 899 (N.D. Ill. 2004) ("Instead of making any particular methodology the sin qua non of reliability, a court must keep its eye on the ultimate question: Do the methods used by a witness adequately guarantee that his or her findings (while not necessarily correct, a matter for the factfinder to decide at trial) are at least reliable . . . ?").

18

As stated *supra*, after the run-out Carbonara inspected Furnace No. 3 and took photographs.  He also interviewed Superior's key employees and reviewed Superior's records relating to the maintenance and repairs of Furnace No. 3.  In addition, he reviewed reports relating to infrared tests that were performed on Furnace No. 3, and he considered Sandhage's report, together with Sandhage's supporting documents and photographs.  Finally, Carbonara inspected and measured the refractory bricks.  Carbonara's approach of utilizing his expertise and experience, observing and analyzing the facts and data, and utilizing deductive reasoning to reach a conclusion, is a scientifically valid methodology. *See*, *e.g.*, *Bitler v. A.O. Smith Corp*., 400 F.3d 1227, 1235 (10th Cir. 2004) (finding in a case involving the causation of an explosion that expert's experience, training, method of observation, and deductive reasoning were sufficiently reliable to constitute a scientifically valid methodology); *Watson v. Snap-On Tools, Inc*., No. 04-1313-A, 2006 WL 2114558, at *5 (W.D. La. July 26, 2006) (admitting the opinion of an engineer holding himself out as an expert in failures analysis who based his opinion at least in part upon the appearance of the failed product, the lack of evidence of other explanations for the failure, and the testimony of witnesses).

Furthermore, after gathering these facts and data, Carbonara explains that he ruled out other possible causes of the run-out. (Carbonara Aff. ¶ 23.)  Eliminating possible causes of a loss is a scientifically valid method for determining causation in certain circumstances. *See*, *e.g.*, *id*. at 1237-38 (eliminating alternative possible causes and arriving at a highly probable cause was sufficiently reliable scientific methodology to establish the cause of a gas leak); *St. Paul Mercury Ins. Co., v. Viking Corp.*, No. 04-C-1124, 2007 WL 129063, at *12 (E.D. Wis. Jan. 12, 2007) (articulating in a sprinkler failure case that "the general methodology of process of

19

elimination is reliable"); *Rudd v. Gen. Motors*, 127 F. Supp. 2d 1330, 1343 (M.D. Ala. 2001) (articulating that an engineer's conclusion based on the process of elimination regarding whether a fan blade was defective was sufficiently reliable, as "[i]nference chains built upon circumstantial evidence are a well-established feature of admissible expert testimony").

In addition, while Superior more specifically criticizes Carbonara for failing to base his deterioration methodology on a measurement of the bricks' height and for not performing any type of "stress test" on the bricks, these criticisms are more appropriately reserved for cross-examination. *See Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1097-98 (N.D. Ill. 2001) (emphasizing to defendant that it was free to cross-examine plaintiff's roofing expert, whose opinion was based on firsthand observation combined with extensive roofing experience, concerning his methodology). "[An expert's] decision to use one form of scientific methodology . . . as opposed to another . . . goes to the expert's credibility, not the admissibility of his testimony." *Troutner v. Marten Transp., Ltd.*, No. 2:05-CV-40-PRC, 2006 WL 3523542, at *6 (N.D. Ind. Dec. 5, 2006); *see also NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789-90 (7th Cir. 2000); *see generally Daubert*, 509 U.S. at 596.

### 4. Carbonara Considered the Design and Operation of the Furnace

Finally, Superior contends that "[t]here is no evidence, other than Carbonara's speculation, that, even if the bricks did expand, the expansion had anything to do with the run-out." (Pls.' Mem. in Supp. at 18.)  It explains that Furnace No. 3 was specifically designed to compensate for expansion and contraction caused by fluctuating temperatures inside the furnace, as it incorporated a four and one-half inches thick layer of insulation in the walls that served as a cushion against which the floor, roof, and other wall components can push without

compromising the structural integrity of the wall itself. (Kelley Aff. ¶¶ 49-65.)  While it concedes that Carbonara acknowledges the presence of this insulation and its function, Superior contends that "he did not even consider it when rendering his opinions," even though his theory is clearly based on the stress created by the expansion of the bricks against the walls.

Clearly, Carbonara considered the design and operation of the furnace in forming his opinion, as he expressly discussed it in his report. (*See* Defs.' Resp. Tab 4.)  The extent to which he considered the insulation in his analysis does not render his opinion inadmissible, as "normally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 423 (7th Cir. 2000) (quoting *Bazemore v. Firday*, 478 U.S. 385, 400 (1986)).  Of course, Superior is free to explore Carbonara's consideration of the insulation and its function during cross-examination. *Spearman Indus.*, 138 F. Supp. 2d at 1097-98; *see also NutraSweet Co.*, 227 F.3d at 789-90; *Troutner*, 2006 WL 3523542, at *6.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Preclude or Limit the Testimony of Robert Carbonara (Docket # 74) is hereby DENIED.

SO ORDERED.

Enter for the 25th day of June, 2007.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge