UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| SUPERIOR ALUMINUM ALLOYS, LLC, ) <br> and OMNISOURCE CORPORATION, ) <br>   ) <br> Plaintiffs, ) <br>   ) <br> v.  ) <br>   ) <br> UNITED STATES FIRE INSURANCE ) <br> COMPANY, et al., ) <br>   ) <br> Defendants.  ) | CAUSE NO. 1:05-CV-207 |

## OPINION AND ORDER

On March 25, 2004, a sudden and unexpected run-out of molten aluminum occurred in one of the furnaces used in the aluminum melting operations of Plaintiff Superior Aluminum Alloys, LLC. Superior Aluminum is a single-member limited liability company whose sole member is Plaintiff OmniSource Corporation, a metal scrap manager, broker, and processor.[1] The insurance policy in effect at the time of the run-out was procured for Superior by Defendant Sky Insurance, Incorporated, an insurance agency and brokerage firm.[2] After Defendant United States Fire Insurance Company denied insurance coverage under the policy,[3] Superior sued U.S. Fire and Sky, alleging that U.S. Fire breached its insurance policy with Superior by failing to cover its claim and that Sky was negligent in procuring the policy and in advising Superior

---

[1] For ease of reference, the Plaintiffs are referred to collectively as "Superior."

[2] In 1999, Picton Cavanaugh Insurance Agency became a subsidiary of Sky Financial Group. (Dep. of William Fether ("Fether Dep.") 12; Dep. of Robert C. Hawker, CPCU, ARM ("Hawker Dep.") 6.) Eventually, Picton Cavanaugh changed its name to Sky Insurance, Incorporated. (Fether Dep. 13-14.) For ease of reference, these entities are collectively referred to as "Sky."

[3] Defendant Crum & Forester Holding, Inc. is the parent company of United States Fire Insurance Company; for ease of reference, they will be referred to collectively as "U.S. Fire."

during this procurement.[4]

Sky now moves for summary judgment on the negligence claims that Superior asserted against it.[5] (Docket # 59.) For the following reasons, Sky's motion will be GRANTED.

## I. FACTUAL AND PROCEDURAL BACKGROUND[6]

By 2000,[7] Sky began procuring a wide-range of insurance for OmniSource's ten subsidiaries, including Superior Aluminum, policies such as general liability, property and casualty, automobile, worker's compensation, pollution liability, and boiler and machinery. (Dep. of Jennifer Wilson ("Wilson Dep.") 26.) At that time, Superior specifically informed Sky that insurance coverage for molten metal run-outs was one of their "prime" interests. (Wilson Dep. 28.)

After Superior gave Sky a complete list of its "exposures," Sky marketed Superior's insurance needs to insurers and discussed the various insurance options with Superior. (Wilson Dep. 29-30.) Jennifer Wilson, OmniSource's "Vice President of Treasury," testified that she expected Sky to "review and interpret the policies" and to explain any significant differences

---

[4] Jurisdiction exists under 28 U.S.C. § 1332(a). Accordingly, when sitting in diversity, the court applies the law of the state originating the controversy, "attempting to predict how the [state] Supreme Court would decide the issues presented." *Smith v. Equitable Life Assurance Soc. of the U.S.*, 67 F.3d 611, 615 (7th Cir. 1995). In this instance, Indiana law applies.
    Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

[5] U.S. Fire also filed a motion for summary judgment (Docket # 67), which will be addressed by the Court in a separate, contemporaneous order.

[6] For summary judgment purposes, the facts are recited in the light most favorable to Superior, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[7] Although William Fether, a broker from Sky who was the "lead person" on Superior's account, testified that he had an insurance-related relationship dating from the mid-1990's with Gary Rohrs, the Executive Vice President and Chief Financial Officer of OmniSource, it is unclear whether he worked with Rohrs in connection with Rohrs's individual insurance needs or OmniSource's business needs or whether Sky was a party to this relationship. (Fether Dep. 37, 42, 46.) In any event, at least by 2000, OmniSource was working with Sky. (Rohrs Dep. 20.)

among insurance carriers, since she did not consider herself an expert in that field.[8] (Def. Sky Insurance, Inc.'s Br. in Supp. of Its Mot. for Summ. J. ("Br. in Supp.") 5; Wilson Dep. 30-31, 62, 67.) However, Superior, and not Sky, had the ultimate authority to choose the insurer and the extent of insurance coverage.[9] (Dep. of Leslie Talkington 83; Wilson Dep. 30-31.)

Superior originally chose a commercial property and casualty insurance policy with American Guarantee and Liability Insurance Company. (Br. in Supp. Tab 5 at 12-28.) This "all risk" policy is generally referred to by the parties as the "Zurich policy" and contained exclusions for "wear and tear" and "faulty design." (Br. in Supp. Tab 5 at 26-27.) Notably, the Zurich policy, unlike some other policies, did not specifically exclude coverage for molten metal run-out. (Fether Dep. 36-37, 50, 54, 59, 61-62.)

On May 23, 2001, while the Zurich policy was in effect, Superior's furnace # 1 experienced a molten metal run-out that caused damage and required the replacement of the furnace. (Br. in Supp. Tab 15 at 7; Rohrs Dep. 33.) After Superior notified Zurich of the loss, Zurich assigned the claim to an adjuster and hired a consultant to evaluate the damages. (Br. in Supp. Tab 7 at 2.) During the claims process, Fether "continually" assured Superior that the loss

---

[8] Furthermore, Superior contends that "Sky's role, or at least its representations as to its expertise, went far beyond merely procuring insurance." (Pls.' Br. in Opp'n to Sky Insurance Inc.'s Mot. for Summ. J. ("Resp. Br.") 3.) To support its position, Superior points to Sky's representations on its website that it knows "the best way to uncover those special risks . . . and understand the unique exposures of your business" and that its insurance services include "specialty coverage." (Fether Dep. 45-47.) Additionally, Sky represents on its website that it is available to advise clients "on risk identification, loss resolution . . . or any critical business decisions that require the appropriate insurance protection" and that it tries to become a partner with the businesses it represents. (Fether Dep. 45-48.)

Morever, in a letter Sky addressed to Superior regarding the standard services that are included in Sky's fee, Sky promised to "implement a structured risk-analysis model," quantify the risks generated by Superior's business activities, and customize an insurance policy for Superior's needs. (Fether Dep. 48-50.) Sky also wrote that it would assist in the claims process "from insurance company notification to cutting a check to fixing the damage." (Fether Dep. 51-52.)

[9] Specifically, Wilson would gather information concerning the various policy options and would make a recommendation to Rohrs; although the two would then discuss the decision, Rohrs had the ultimate authority to determine which insurance policy would be purchased. (Wilson Dep. 19.)

would be covered (Wilson Dep. 42, 46), and ultimately Zurich determined that the loss was covered by the policy and reimbursed Superior for the claim less the deductible. (Br. in Supp. Tab 15 at 7.)

However, according to Fether, when it came time to renew the policy, "Zurich didn't want to have anything to do with [Superior.]" (Fether Dep. 217.) Specifically, Fether testified that Zurich "declined to quote, or they set the number so high that it would basically pay for the furnace in premiums." (Fether Dep. 217.) Subsequently, in 2001 and 2002, Sky procured policies from the New Hampshire Insurance Company on behalf of Superior, containing "wear and tear" and "faulty design" exclusions. (Br. in Supp. Tab 5 at 40-60.)

With the second policy from the New Hampshire Insurance Company set to expire, Sky again began the process of procuring insurance on behalf of Superior. Once again, Sky was told of the importance of covering any molten metal run-outs.[10] (Wilson Dep. 43-44.) Although Sky approached fifty-three insurance companies with Superior's insurance needs, only three provided a quote.[11] (Fether Dep. 62.) Superior ultimately chose an "all risk" policy with U.S. Fire containing "wear and tear" and "faulty design" exclusions but no molten metal run-out exclusion. (Br. in Supp. Tab 5 at 30-38.)

Superior's policy was the first that Fether brokered with U.S. Fire to cover a furnace, and overall Sky had "very limited experience" with U.S. Fire. (Fether Dep. 67-68.) Fether, however, conducted no research regarding how U.S. Fire treated claims for molten metal run-out from

---

[10] Indeed, Fether admits that he had discussions with Superior concerning coverage for molten metal run-out and that Superior made it clear to him that such coverage was important. (Fether Dep. 54-55, 58, 61.)

[11] Fether explained that Superior was in a "risky business" that "most carriers didn't have an appetite for." (Fether Dep. 62.)

furnaces, nor did he investigate whether U.S. Fire had a tendency to deny and fight insurance claims. (Fether Dep. 68, 71-72.) He also did not explain to Superior that the "wear and tear" and "faulty design" exclusions could possibly apply to a molten metal run-out or that certain insurers "have a tendency to deny claims first and fight them" rather than presume them to be covered claims. (Fether Dep. 69-71; Wilson Dep. 198-99.) Instead, Fether simply told Superior that the exclusions in the U.S. Fire policy were the same exclusions that were in its previous policies. (Fether Dep. 71.)

While the U.S. Fire policy was in effect, but before Superior received a copy of the policy, the molten metal run-out at issue in this case occurred in furnace # 3.[12] (Wilson Dep. 81.) After Superior submitted the loss to U.S. Fire, it assigned the claim to its adjuster and hired a senior analyst to evaluate Superior's damages. (Br. in Supp. Tab 9 at 2.) Although Fether assured Superior "numerous times" during the claims process that the loss would be covered under the insurance policy (Wilson Dep. 58-59, 80), U.S. Fire ultimately denied coverage, invoking the "wear and tear" and "faulty design" exclusions.[13]

Although Wilson was surprised to hear that these exclusions applied to this loss, she knew that they were common in commercial property policies and that Fether had no role in determining whether U.S. Fire would cover the loss. (Wilson Dep. 58-59, 81.) Likewise, Rohrs

---

[12] Fether testified that this loss was "very similar" to the prior loss at furnace # 1. (Fether Dep. 65.)

[13] Specifically, U.S. Fire wrote in the letter denying coverage: "The cause of the [run out] . . . was cracking of the refractory block in the #3 furnace floor. The cracking was caused by wear and tear and deterioration from the hostile environment of furnace operation." (Br. in Supp. Tab 14 at 2-3.) Later, in asserting affirmative defenses to Superior's Complaint, U.S. Fire added that the "cause of the alleged loss . . . was faulty, inadequate or defective design, specifications, workmanship, repair, constructions, renovation, remodeling and/or materials used in repair, constructions, renovation or remodeling." (Answer & Am. Affirmative Defenses to Compl. for Declaratory Relief & Damages ¶ 76.)

5

understood that Sky had no control over the way that insurers apply policy language to a specific loss and that exclusions for "wear and tear" and for "faulty design" are generally included in commercial property insurance policies. (Rohrs. Dep. 36-37, 45.) Indeed, those exclusions "are universally included in property insurance policies." (Dep. of William J. Warfel, Ph.D., CPCU, CLU ("Warfel Dep.") 124.) In fact, all of the policies Sky procured for Superior contained such exclusions. (Br. in Supp. Tab 5.) Moreover, Superior does not contest Sky's assertion that there are no material differences between the "wear and tear" and "faulty design" exclusions in the Zurich and U.S. Fire policies. (Warfel Dep. 105-06.)

Superior advances two theories of negligence against Sky, contending that Sky negligently procured insurance with U.S. Fire and negligently advised Superior during this procurement. Regarding its claim of negligent procurement, Superior essentially maintains that Sky had a duty to determine how U.S. Fire would treat a claim for molten metal run-out, research U.S. Fire's claim history for the "wear and tear" and "faulty design" exclusions, and ultimately learn that U.S. Fire "aggressively" rejects claim. According to Superior, Sky should have procured coverage from an insurer that gives policies a "broad" interpretation (e.g., Zurich).

Moreover, Superior contends that Sky negligently failed to advise it that U.S. Fire could interpret its policy in such a way as to deny coverage for molten metal run-out, that it might invoke an exclusion, and that it was "aggressive" in its claims approach. Finally, Superior wishes to hold Sky liable for Fether's alleged statement that *any* molten metal run-out would be covered under the U.S. Fire policy.

6

## II. LEGAL STANDARD

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## III. DISCUSSION

Superior asserts two negligence theories against Sky: (1) negligent procurement of insurance; and (2) negligent advisement. Moreover, in its response brief, Superior adds a promissory estoppel claim to its theories of recovery, which is ostensibly related to Fether's alleged statement that any molten metal run-out would be covered under the U.S. Fire policy. None of these theories, however, are ultimately successful.

**A. Superior's Negligent Procurement Claim Fails As a Matter of Law**[14]

Under Indiana law, a plaintiff must establish three elements in order to succeed on a negligence claim: "(1) a duty on the part of the defendant owed to the plaintiff; (2) a breach of that duty; and (3) an injury to the plaintiff proximately caused by the breach." *Coffman v. PSI Energy, Inc.*, 815 N.E.2d 522, 527 (Ind. Ct. App. 2004). Here, Superior asserts that Sky was negligent when it procured the U.S. Fire policy on behalf of Superior. In that regard, "[a]n insurance agent or broker who undertakes to procure insurance for another is an agent of the proposed insured, and thus owes his principal a duty to exercise reasonable care, skill and diligence in effecting the insurance." *Dreibelbiss Title Co., Inc. v. MorEquity, Inc.*, 861 N.E.2d 1218, 1222 (Ind. Ct. App. 2007) (citing *Bulla v. Donahue*, 366 N.E.2d 233, 236 (Ind. Ct. App. 1977)). Accordingly, "if an agent undertakes to procure insurance and through his fault and neglect fails to do so, he is liable to his principal for any damage resulting therefrom."[15] *Id.*

At the outset, Sky argues that it cannot be liable for failing to procure insurance because it procured the insurance that Superior requested, that is, the same coverage as the Zurich policy. *See Morgan v. Tackitt Ins. Agency, Inc.*, 852 N.E.2d 994, 999 (Ind. Ct. App. 2006) ("An agent may thus be held to answer in damages if his principal suffers a loss *after the agent has failed to obtain insurance*.") (quoting *Anderson Mattress Co., Inc. v. First State Ins. Co.*, 617 N.E.2d 932, 939 (Ind. Ct. App. 1993)) (emphasis added)). Specifically, Sky argues that the "material terms"

---

[14] Superior asserts a "change in coverage" claim separate from its negligent procurement claim; however, it cites no Indiana law recognizing a distinct "change in coverage" cause of action. Indeed, Superior does little to distinguish these theories of recovery, and thus the Court will address them as one.

[15] "The action against the agent may be for breach of contract or for negligent default in the performance of a duty imposed by contract." *Dreibelbiss*, 861 N.E.2d at 1222. Here, Superior advances only a negligence claim against Sky.

8

of the U.S. Fire and Zurich policies were the same, as both excluded coverage for "wear and tear" and "faulty design" but did not exclude molten metal run-out.

Superior counters that Sky did, in fact, fail to procure insurance coverage because it should have obtained the same coverage as the Zurich policy. Superior ostensibly does not challenge Sky's assertion that the terms of the polices were materially the same (*see* Resp. Br. 10); instead, it argues that the coverages differed because Zurich "broadly" interpreted its policy to provide coverage, while U.S. Fire "aggressively" interpreted its policy to deny coverage. According to Superior, Sky should have procured insurance with a company with an approach similar to Zurich, that is, a company that interprets its policies "broadly" to provide coverage for molten metal run-out.

Superior's argument, however, suffers from a fatal flaw–its contention that Zurich "broadly" interpreted its policies and that U.S. Fire "aggressively" interpreted its policies finds no support in the record. *See, e.g.*, *Taylor v. Monsanto Co.*, 150 F.3d 806, 809 (7th Cir. 1998) (noting that "self-serving allegations unsupported by the record" do not preclude summary judgment). Indeed, there is nothing in the record to suggest that Zurich, or any other insurance provider, has a practice of interpreting its policy language "broadly" to cover losses. Moreover, Superior's assertion that U.S. Fire is "aggressive" is based solely on the *ipse dixit* of its expert, Greg Deimling, testimony that has been stricken from the record in a separate, contemporaneous order.

Accordingly, Superior's claim that Sky failed to procure the requested insurance when it obtained a policy from an "aggressive" insurer rather than a "broad" one is based on unsupported

9

speculation, which cannot defeat summary judgment.[16] *See, e.g.*, *Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005) ("'[M]ere speculation or conjecture' will not defeat a summary judgment motion." (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003))); *Coffman*, 815 N.E.2d at 527 (noting that although "summary judgment is generally inappropriate in negligence cases . . . whether the evidence produced by a plaintiff is sufficient to establish a cause of action for negligence is a question of law to be decided by the court").

Moreover, even if the Court assumes that Sky failed to procure the proper insurance, Superior's claim that Sky's conduct during this procurement was negligent fails as a matter of law. In that regard, Superior maintains that Sky had a duty to determine how insurance companies, specifically U.S. Fire, would treat claims for molten metal run-out, research U.S. Fire's claim history for the "wear and tear" and "faulty design" exclusions, and recommend an insurance company that would interpret its policy to provide coverage. Superior further explains that by breaching those duties, Sky proximately caused Superior's alleged lack of coverage for the loss at issue.

Under Indiana law, "[t]he proximate cause of an injury is not merely the direct or close cause; rather it is the negligent act which resulted in an injury which was the act's natural and probable consequence in light of the circumstances." *Coffman*, 815 N.E.2d at 527. Although proximate cause is "generally a question of fact," *Hellums v. Raber*, 853 N.E.2d 143, 146 (Ind. Ct. App. 2006), in order for an insurance broker to be deemed the proximate cause of an

---

[16] Essentially, Superior is left with only the unsupported argument that because Zurich covered the prior loss and U.S. Fire denied coverage, then the coverages must be different. However, such speculation fails to account for other factors that could have potentially contributed to the different coverage positions; for example, the run-outs occurred at different times and in different furnaces, different investigators investigated the run-outs, and different adjusters handled the claims.

insured's injuries, the insured must demonstrate that other coverage was available for purchase that would have applied to the loss. *Cook v. Keister*, No. C3-96-1268, 1997 WL 65512, at *2 (Minn. Ct. App. Feb. 18, 1997) ("To prove causation in a negligence action against an insurance agent, a plaintiff must produce evidence demonstrating that absent the agent's negligence, the plaintiff . . . would have obtained coverage sufficient to prevent his or her loss . . . ."); *see also Royal Maccabees Life Ins. Co. v. Peterson*, 139 F.3d 568, 570 (7th Cir. 1998); *Huff v. Standard Life Ins. Co.*, 897 F.2d 1075, 1075 (11th Cir. 1990); *Wilson v. Mass. Indem. & Life Ins. Co.*, 920 F.2d 1548, 1553 (10th Cir. 1990); *Lifespan/Physicians Prof'l Servs. Org., Inc. v. Combined Ins. Co. of Am.*, 345 F. Supp. 2d 214, 228 (D.R.I. 2004); *Scalamandre Silks, Inc. v. Fireman's Fund Ins. Co.*, 598 N.Y.S.2d 791 (N.Y. App. Div. 1993); *Bangor-Brewer Bowling Lanes, Inc. v. Commercial Union-York Ins. Co.*, No. CV-99-259, 2001 WL 17192, at *5-6 (Me. Super. July 3, 2001). The reason for this rule is simple–a broker cannot be liable in negligence for failing to obtain insurance when such coverage cannot be purchased. Lee R. Russ, *Couch on Insurance* § 46.67 (3d ed. 2007) ("An insured's agent is not liable for failing to obtain coverage where such coverage is unavailable because it is not offered by the insurer or other insurance companies . . . .").

Sky argues that Superior cannot point to any insurance companies that would have provided coverage for the molten metal run-out at issue, particularly since all policies contain the "wear and tear" and "faulty design" exclusions that were evoked to deny coverage. Superior counters that "Sky cannot argue that it could not obtain insurance that would cover the Loss

11

because it previously obtained insurance that covered the Prior Loss."[17] (Resp. Br. 13.) However, this argument is of no assistance to Superior, as the Zurich policy was no longer available to Superior for purchase. Indeed, Fether's unrefuted testimony is that after the prior loss, "Zurich didn't want to have anything to do with [Superior.]" (Fether Dep. 217.)

Moreover, Fether also testified that of the fifty-three insurance companies he approached with Superior's insurance needs, only three provided a quote, and Superior does not argue that the two companies it did not choose would have provided coverage. In sum, Superior fails to point to any evidence of record to establish that other insurance was available that would have provided coverage for the loss at issue; accordingly, Superior fails as a matter of law to demonstrate that Sky proximately caused its injuries, and thus summary judgment on its negligent procurement claim must be granted.

### B. Superior's Negligent Advisement Claim Fails As a Matter of Law

In addition to the duties of reasonable care, skill, and diligence that an insurance agent owes to an insured when procuring insurance, the duties of an agent may extend to the provision of advice "only upon a showing of an intimate long term relationship or some other special circumstance." *Am. Family Mut. Ins. Co. v. Dye*, 634 N.E.2d 844, 847 (Ind. Ct. App. 1994) (quoting *Craven v. State Farm Mut. Auto. Ins. Co.*, 588 N.E.2d 1294, 1297 (Ind. Ct. App. 1992)). An agent's alleged failure to advise is treated under Indiana law "as a claim for breach of

---

[17] Superior specifically asserts that "[i]f the insurance agent undertakes to procure insurance for a particular risk *previously covered* . . . and fails to do so, the agent is liable to the insured . . . ." (Resp. Br. 13 (emphasis added).) In support, Superior cites two cases: *Filip v. Block*, 858 N.E.2d 143, 152 (Ind. Ct. App. 2006), *transfer granted*, *vacated*, 2007 Ind. LEXIS 248, at *1 (Ind. Apr. 17, 2007), and *Steward v. City of Mt. Vernon*, 497 N.E.2d 939, 942 (Ind. Ct. App. 1986). However, neither case stands for that specific proposition, and in any event, the *Filip* opinion has since been vacated by the Indiana Supreme Court. Furthermore, in *Steward*, negligent failure to procure insurance was not even at issue. *See Steward*, 497 N.E.2d at 942-43.

fiduciary duty arising out of a negligent failure to advise. *Id.* Morever, "the plaintiff must demonstrate some type of special relationship [with the agent] before the duty to advise arises . . . ."[18] *Craven*, 588 N.E.2d at 1297.

Here, Sky concedes for purposes of summary judgment that such a special relationship exists between it and Superior, giving rise to a fiduciary duty to advise. Superior maintains that due to their "special relationship," Sky had the duty to advise it of the following:

> (1) "Once Zurich covered the Prior Loss, Sky had a duty, when the parties next convened, to advise Plaintiffs that, although Zurich covered the Prior Loss, other insurers might not interpret their policies in such a manner or might invoke exclusions."
> (2) "When Sky obtained coverage from U.S. Fire, Sky had a duty to advise Plaintiffs that U.S. Fire might not interpret their Policy to cover a molten metal run-out or might invoke an exclusion."
> (3) "If Sky [after researching 'how U.S. Fire interpreted its exclusions and whether it took an aggressive stance on its exclusions'] did not believe that it could provide coverage for molten metal run-out, it had a duty to advise Plaintiffs of the same."
> (4) "If Sky believed that coverage could possibly be provided but, that an insurer might invoke its exclusions or otherwise deny coverage, it should have advised Plaintiffs of this fact."

(Resp. Br. 17.)

Stated simply, Superior ostensibly requests that the Court impose a duty on insurance brokers to discuss how each exclusion in an "all risk" policy might be invoked to deny coverage for a particular loss. *See Am. Family Mut. Ins. Co.*, 634 N.E.2d at 848 ("The existence of duty is a question of law for the court . . . ."). Not surprisingly, Superior cites no case in support of

---

[18] Some of the factors relevant to determining whether a special relationship exists include: "(1) exercising broad discretion to service the insured's needs; (2) counseling the insured concerning specialized insurance coverage; (3) holding oneself out as a highly-skilled insurance expert, coupled with the insured's reliance upon the expertise; and (4) receiving compensation, above the customary premium paid, for the expert advice provided." *Am. Family Mut. Ins. Co.*, 634 N.E.2d at 848.

13

imposing such a duty. In fact, the Seventh Circuit Court of Appeals has determined otherwise, explaining that "[t]he very nature of an 'all risk' policy dictates that a major portion of the policy terms will be exclusions. . . . An insurance broker is under no duty to detail every term of every policy he offers to his customer, particularly where the policy plainly covers all of the risks for which the customer specifically requested coverage." *Gust K. Newberg Constr. Co. v. E.H. Crump & Co.*, 818 F.3d 1363, 1366 (7th Cir. 1987).

Indeed, imposing a duty on a broker as a matter of law to discuss every exclusion of each "all risk" policy that the broker procured for his client would be particularly problematic here, as Sky procured a wide-range of insurance for OmniSource's ten subsidiaries. Moreover, Wilson and Rohrs both admitted that they knew the exclusions at issue here are generally included in commercial property policies. Accordingly, Superior fails to demonstrate why the Court should impose, as a matter of law, such proffered duties; thus, summary judgment on its negligent advisement claim must be granted.

**C. Nothing in the Record Supports Superior's Allegation of Misrepresentation**

Finally, Superior wishes to hold Sky liable for Fether's alleged misrepresentation that *any* molten metal run-out, ostensibly including the run-out at issue, would be covered under the U.S. Fire policy.[19] Sky counters that "the presence of the 'wear and tear' and 'faulty design'

---

[19] When arguing under the estoppel theory, Superior offers only the following conclusory assertions:
In this case, the facts viewed in the light most favorable to the Plaintiffs demonstrate that a promise was made by Sky to the Plaintiffs, the Plaintiffs reasonably relied on the promise by Sky, and the promise was relied upon to the Plaintiffs' detriment. Under these circumstances, Sky should be estopped from passing the buck to U.S. Fire or trying to blame the Plaintiffs for not reading a policy that they did not even have. Sky should be required to respond in damages for what its promised coverage should have provided.

(Resp. Br. 20.)

Nevertheless, both parties' arguments pertaining to Fether's alleged statement are thoroughly detailed under the negligent failure to advise claim. Indeed, claims related to an insurance agent's misrepresentations sound in constructive fraud under Indiana law, which is the "breach of a *legal or equitable* duty." *See Medtech Corp. v. Ind.*

14

exclusions . . . were plainly apparent" and that "no reasonable policyholder, after complying with its basic duty to learn the contents of its policy, could conclude that these exclusions would for some reason not apply to a molten metal loss." (Br. in Supp. 21-22.)

Under Indiana law, an insured has a duty to read and understand the terms of its insurance policy. *Rollings Burdick Hunter of Utah, Inc.*, 665 N.E.2d 914, 922 (Ind. Ct. App. 1996); *Page v. Hines*, 594 N.E.2d 485, 487 (Ind. Ct. App. 1992); *Medtech*, 555 N.E.2d at 849; *Vill. Furniture, Inc. v. Associated Ins. Managers, Inc.*, 541 N.E.2d 306, 308 (Ind. Ct. App. 1989). Nevertheless, "reasonable reliance upon an agent's representations can override an insured's duty to read the policy."[20] *Rollings Burdick Hunter*, 665 N.E.2d at 922; *Page*, 594 N.E.2d at 487; *Medtech*, 555 N.E.2d at 850; *Vill. Furniture*, 541 N.E.2d at 308. Indeed, the Seventh Circuit has recognized:

> It is true that courts in Indiana and elsewhere, realizing that many people do not read their insurance policies and, perhaps even more important, do not do so because the policies are unreadable, have held that the agent's oral representations at the time of sale can override the written terms of the policy. If the agent insists to the prospective purchaser that the policy will insure against a hazard . . . that the prospect is particularly concerned about, and the hazard materializes, the company may be estopped to plead the terms of the policy because the strength of the agent's oral assurances lulled the prospect into not reading, or reading inattentively, dense and rebarbative policy language.

*Burns v. Rockford Life Ins. Co.*, 740 F.3d 542, 544 (7th Cir. 1984) (internal citations omitted).

Accordingly, if Superior reasonably relied on Sky's alleged misrepresentation that any molten metal run-out would be covered under the U.S. Fire policy, then Sky's misrepresentation

---

*Ins. Co.*, 555 N.E.2d 844, 848-49 (Ind. Ct. App. 1990) (emphasis added). Accordingly, the Court will treat the negligence and estoppel claims concerning Fether's alleged statements together.

[20] "[W]hether a party's reliance upon an agent's representations is reasonable even though he failed to exercise the opportunity to read the policy is a question of fact for the factfinder." *Plohg v. NN Investors Life Ins. Co., Inc.*, 583 N.E.2d 1233, 1237 (Ind. Ct. App. 1992).

15

would override the terms of the U.S. Fire policy, including the "wear and tear" and "faulty design" exclusions.

However, the question of reasonable reliance need not be reached, as Superior's assertion that Fether informed them that any molten metal run-out would be covered under the U.S. Fire policy is merely a self-serving allegation unsupported by the record. *See, e.g.*, *Taylor*, 150 F.3d at 809 (noting that "self-serving allegations unsupported by the record" do not preclude summary judgment). Instead, the portion of the record that Superior cites to support its argument pertains to representations Fether made concerning the *prior loss*. Specifically, Fether "continually" assured Superior during the claims process that the *Zurich policy* would cover the prior loss. (Wilson Dep. 42, 46.) Such assurances that Zurich would cover that specific molten metal run-out are clearly not representations that the U.S. Fire policy, which would not be procured until three years later, would cover any future run-out.

Moreover, even though Fether allegedly assured Superior "numerous times" after the run-out at issue that the loss would be covered under the U.S. Fire policy (*see* Wilson Dep. 58-59, 80), Superior fails to explain how it detrimentally relied on any representations made *after* the U.S. Fire policy was purchased and the loss occurred. *See Medtech*, 555 N.E.2d at 848-49 (noting that one of the elements of a constructive fraud claim is "reliance on [the agent's] representation or omission by the individuals to whom the duty is owed and to the detriment of that individual"). Accordingly, Superior's claim, sounding in constructive fraud, fails.

Finally, insofar as Superior asserts an estoppel claim against Sky, that claim was added too late. Superior never pled such a claim, nor did it give any indication before its response brief

that it wished to assert an estoppel claim.[21] It is well-accepted in the Seventh Circuit that "a plaintiff may not amend his complaint through arguments in his brief in opposition to summary judgment." *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002); *see also Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997) (noting that it was "too late in the day" for the plaintiff to bring a promissory estoppel claim because he "did not include the promissory estoppel claim in his complaint or his amended complaint, adding it only at the summary judgment stage"). Accordingly, Superior is not permitted to belatedly assert an equitable estoppel claim.[22]

## IV. CONCLUSION

For the foregoing reasons, Sky's motion for summary judgment (Docket # 59) is GRANTED. The Clerk is directed to enter a judgment in favor of Sky and against Superior Aluminum and OmniSource.

SO ORDERED.

Enter for June 25, 2007.

S/Roger B. Cosbey,<br>
Roger B. Cosbey<br>
United States Magistrate Judge

---

[21] Instead, Superior's complaint pled only negligence theories against Sky. (Compl. ¶¶ 37-38.)

[22] Because all of Superior's theories of recovery fail as a matter of law, the Court need not consider Sky's argument that Superior did not sustain its burden of proving damages.