**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **SUPERIOR ALUMINUM ALLOYS, LLC,** | ) | |
| **and OMNISOURCE CORPORATION,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:05-CV-207** |
| | ) | |
| **UNITED STATES FIRE INSURANCE** | ) | |
| **COMPANY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

### I. INTRODUCTION

Plaintiffs Superior Aluminum Alloys, LLC, and its parent company, OmniSource

Corporation (together, referred to herein as "Superior"), operate an aluminum melting plant in

New Haven, Indiana. (Compl. ¶¶ 2, 13, 19.)  On March 25, 2004, Superior experienced a sudden

and unexpected run-out of molten aluminum from one of its furnaces, causing severe damage to

the furnace and Superior's surrounding property. (*Id.* ¶ 20.)  Superior's insurance claim for the

incident, however, was denied. (*Id.* ¶ 26.)

Consequently, Superior brought this suit against its insurer, Defendant United States Fire

Insurance Company ("U.S. Fire") and U.S. Fire's parent company, Crum & Forster Holding, Inc.

("Crum & Forster"), alleging that U.S. Fire and Crum & Forster breached its insurance policy

with Superior by failing to cover its claim. (*Id.* ¶¶ 4, 14, 24, 27.)  Superior also named its

insurance agent, Sky Insurance, Inc. ("Sky"), as a Defendant, alleging that Sky was negligent

when it procured an insurance policy for Superior that failed to cover damages arising from a

furnace run-out.[1] (*Id.* ¶¶ 5, 15-16, 37.)

U.S. Fire and Crum & Forster now move for summary judgment on all claims (Docket # 67), contending that there is no dispute that Superior's loss was caused by "cracking" of the furnace's brick refractory floor and, consequently, that U.S. Fire is entitled to summary judgement as a matter of law under the "cracking exclusion" in its insurance policy."[2] (Defs.' Mot. for Summ. J. ¶ 4.)  For the reasons provided herein, the motion will be DENIED as to U.S. Fire, but will be GRANTED with respect to Crum & Forster.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[3]

Superior is engaged in the business of acquiring scrap aluminum, melting it, and selling the refined aluminum to customers who use it to manufacture various products, particularly products for use in the automotive industry. (Compl. ¶ 2, 19; Dep. of Denny Luma at 78.) Superior melts its scrap aluminum in large steel furnaces, one of which is the furnace giving rise to this controversy – Furnace No. 3. (*Id.*; Dep. of Tim Monks at 10, 47-55.)

### A.  Background of Furnace No. 3

Furnace No. 3 has been in production since 2000 and is referred to as a secondary aluminum furnace, which means it melts scrap instead of refining ore to make metal.[4] (Luma

---

[1] Diversity jurisdiction exists under 28 U.S.C. § 1332(a).  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

[2] Sky also filed a motion for summary judgment. (Docket # 59.)  In addition, Defendants moved to bar Greg Deimling and Dr. Kenneth Sandhage, Superior's proffered expert witnesses, and Superior moved to preclude or limit the testimony of Dr. Robert Carbonara, U.S. Fire's designated expert witness. (Docket # 72, 74, 77, 100.)  These motions are addressed by the Court in separate, contemporaneously-entered opinions.

[3] For summary judgment purposes, the facts are recited in the light most favorable to Superior, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[4] The operating conditions in a secondary furnace are different than a primary furnace, as secondary furnaces are generally smaller, receive rougher treatment, and operate in a harsher environment. (Dewey Dep. at 91-

Dep. at 131; Dep. of William Dewey at 90-91.)  Its perimeter is encompassed by a large steel shell that rests on steel I-beams, and its floor, or "hearth," is made up of refractory brick.[5] (Monks Dep. at 48-51, Ex. 127; Dep. of Carl Kelley at 31-32.)  The refractory brick is 13.5 inches long and is stood on end, causing the depth of the refractory brick floor to measure 13.5 inches. (Kelley Dep. at 31-32.)  The other dimensions of the refractory brick are 3 inches by 4.5 inches. (*Id*. at 55-56.)  Underneath the refractory brick is nine inches of castable lining, also known as the "sub-hearth," and underneath the lining is a steel skin (*Id*. at 31-32.)  During operation of Furnace No. 3, the molten aluminum sits directly on top of the furnace's refractory brick floor. (*Id*. at 29, 31.)

Carl Kelley, Superior's Director of Engineering and Maintenance, described Superior's type of furnace as a "living, breathing kind of structure that you have to pay attention to.  It's not like a brick wall." (*Id*. at 191.)  The furnace's steel shell is designed to and does, in fact, move during operation. (Dep. of Michael Davis at 49.)  Thus, the shell's condition affects how long the refractory in the furnace will last. (*Id*.)  If the shell cracks or separates, it will cause a major shifting of the refractory in the furnace. (*Id*.)  Similarly, if repair welds on the shell break, the refractory will start to crack. (*Id*. at 51-53.)

Thermal stresses occur in the normal operation of a furnace, as a furnace begins to wear out as soon as it is put into operation, due in part to the thermal stress generated by the heat of the furnace operation. (Kelley Dep. at 190-91.)  The more a furnace produces, the more wear and

92.)

---

[5] When used as an adjective, the term "refractory" means "capable of enduring high temperature," and when used as a noun, it refers to "a heat-resisting ceramic material." Merriam-Webster OnLine, http://www.m-w.com/dictionary (last visited June 21, 2007).

tear there will be on the furnace. (Dewey Dep. at 94.)  More specifically, heating and cooling of a furnace causes thermal stresses within the interior of the furnace, including on the refractory, and the thermal stresses on the refractory can cause it to deteriorate and crack. (*Id*. at 97, 103-04; Davis Dep. at 106-07.)  In addition, normal maintenance can cause deterioration of the furnace, chemical reactions in the furnace can cause deterioration of the refractory, and furnace floors can deteriorate and wear out over time. (Davis Dep. at 158-59; Dewey Dep. at 104; Expert Report of Robert S. Carbonara, Ph.D., dated Sep. 28, 2006 ("Carbonara's Report"), at 3.)  When the furnace is cooled down, the refractory bricks contract, and when the furnace is heated up, the bricks expand. (Kelley Dep. at 59-60; Dewey Dep. at 96-97.)

In December 2003, just three months before the run-out, Mike Davis, President of Hot Crews, Inc., performed a cold clean of Furnace No. 3 and inspected its floor. (Davis Dep. at 129-30, 133, 152, Ex. 30.)  Hot Crews is a refractory contractor, specializing in refractory linings for large industry furnaces. (*Id*. at 14-15.)  His inspection revealed that there were no open joints, no cracks, and that the bricks were in very good condition. (*Id*. at 138-40.)

## B.  Superior's March 2004 Run-Out and Subsequent Inspections of Furnace No. 3

On March 25, 2004, Furnace No. 3 experienced what is referred to in the industry as a "run-out" or "bleed-out." (*Id*. at 167; Luma Dep. at 39-40; Monks Dep. at 125.)  A run-out means that the shell of the furnace has been compromised and the contents, molten aluminum metal, have spilled out, ruining the furnace.[6] (Monks Dep. at 13.)

_____

[6] Superior experienced at least two other furnace run-outs prior to the Furnace No. 3 incident. (Luma Dep. at 78-79, 80-83, 108-09.)  Furnace No. 1 experienced a failure in 1999, prior to the time it was in production, and in 2001 it experienced a second run-out. (Monks Dep. at 12-13, 24-25, 46-47; Dewey Dep. at 116-17; Luma Dep. at 78-79; Davis Dep. at 23-24, 27.) Another furnace experienced a run-out prior to 2001. (Luma Dep. at 80-83.)
Consequently, Superior replaced the floors of Furnace Nos. 1 and 2, with the floors lasting approximately

### *1. Carl Kelley, Superior's Director of Engineering and Maintenance*

After the run-out, the first that Furnace No. 3 could be examined was the next day, March 26, 2004. (Kelley Dep. at 30-31.)  Carl Kelley, Superior's Director of Engineering and Maintenance and one of Superior's designated expert witnesses, was one of Superior's employees who first entered Furnace No. 3. (*Id*.; Pls.' Disclosure of Expert Witnesses at 1.)  He described the refractory brick as a "crumbled up, heaved up and half caved in pile of brick," observing that some of the bricks were broken all the way down to the sub-hearth. (*Id*. at 32.)  Kelley further stated that the refractory brick had "cleaved" or "split" down through the entire 13.5-inch depth of the refractory brick, commenting that "fractured" is another word to describe what happened. (*Id*. at 31-35, 56-58, 100.)  After digging through the rubble, he also observed that there was a hole in the sub-hearth that ate its way through the nine-inch lining and through the I-beam base. (*Id*. at 32.)  Kelley testified that the run-out occurred because the "refractory lining failed," but further stated: "What caused the refractory lining to fail . . . I can't begin to put my thumb on it." (*Id*. at 34.)

More specifically, Kelley testified:

A.     I saw up close what we had seen from the door, the ledge, the day before, and that was, in the center of the hearth, the large mound of brick and the heaved floor and cleaved edge.

. . .

A.     Directly above [the sub-hearth] is 13 ½ inches of brick, stood on end, so that they're 13 ½ .  One dimension is four and a half [inches], and the other dimension is three [inches].  And along the westmost edge of that crumbled up, heaved up and half caved in pile of brick, there was a section of cleavage in there, where the brick had broken through the middle of the three by four and a half [inch]

---

two-and-a-half to three years. (Davis Dep. at 46-47; Monks Dep. at 12-13, 16.)  Superior states, however, that it did not have the same concern with respect to Furnace No. 3 because of its particular construction and design. (Monks Dep. at 22-23.)

dimension down through the depth of the brick, the entire 13 ½ inch dimension, all the way to the sub-hearth.

. . .

Q.      And I believe yesterday you made a point of telling us that some of these bricks cleaved, as you put it, is that right?

A.      Yes.

Q.      And is that because that was significant to you, sir, that they were cleaved?

A.      Un-huh (affirmative).

Q.      Can you make that a "yes" please?

A.      Yes.

Q.      Now, when you can say "cleaved" you're really talking about kind of split, right?

A.      Yes.

Q.      From top to bottom?

A.      Yes.

(*Id*. at 31-32, 56-57.)

### 2. Tim Monks, Superior's Maintenance Manager

Tim Monks, Superior's Maintenance Manager, was at work when the run-out occurred

and was the second person to see it. (Monks Dep. at 119-121, 125.)  He testified:

A.      Well, we know it was coming out of the floor just by virtue of where it's at.  It couldn't be coming from a wall.  It's got to be coming from the floor, but where in the floor to me has only been speculation at this point.

Q.      Okay, you're referring to the floor.  You're referring to the refractory floor –

A.      Correct.

Q.      – in the furnace?

A.      Correct.  So somewhere in the–there's somewhere in this floor that has
        been breached, and the metal has now gone through the refractory,
        through the steel, and is now coming out through the I-beams.

Q.      What do you mean by "breached"?

A.      Something would have had to have cracked and opened up.  Obviously we
        know in the months leading up to this there is no degradation of the floor.
        There wasn't anything that concerned us.  So for lack of having any wear
        or tear, the only thing that could have happened here is the furnace
        cracking open and dumping this–this metal out.

(*Id.* at 125.)

### 3. Mike Davis, President of Hot Crews, Inc.

Mike Davis, who examined Furnace No. 3 in December 2003 on behalf of Hot Crews,

has also been designated as one of Superior's expert witnesses. (Pls.' Disclosure of Expert

Witnesses at 1.)  He examined Furnace No. 3 within twenty-four hours after the run-out and

concluded that the run-out was caused by the failure of the floor to contain molten aluminum.

(Davis Dep. at 167, 170-71.)  Davis surmised that there was a "sudden heaving of the middle of

the floor," that "the floor lost its integrity," and that the aluminum ran out thereafter. (*Id.* at 168.)

He further explained that the heaving of the floor opened up the joints and then the metal ran out

through the joints, or stated another way, that the heaving of the floor caused the bricks to open

up, resulting in an expanse between the bricks. (*Id.* at 168-70.)

Though he could not opine as to what caused the sudden heaving of the floor, Davis

surmised that there were essentially two levels of failure: the first is that the refractory bricks

heaved and the aluminum ran through the brick, and the second is that the aluminum metal ate a

hole through the castable lining. (*Id.* at 170-72.)  Davis summarized his opinion in a letter to

Superior as follows:

Based upon my 38 years of experience in the refractory industry, the work performed in December 2003, and the inspection of the furnace after the run-out, the failure of the floor was due to a sudden and catastrophic event with the exact cause of the failure being undeterminable.  I have reached this conclusion because the indicators that would be present if the failure were due to a lack of maintenance, abuse, poor operating procedures or normal wear and tear, (such as spalling, excess/large amounts of metal between the subfloor and the hotface brick, or other signs of deterioration) were not present during the cold-clean in December 2003 nor during the inspection after the run-out.

(*Id*. Ex. 30.)

Davis further explained his findings during his deposition:

A.   If the—if the joint—if the crack goes all the way through the floor— and it's – it's a size that it would allow the aluminum to go through without freezing up, then you would have a runout.  If it is a small crack that you would see, let's say a crack like—like four sheets of paper, on heat up, on use of that furnace, that crack, the freeze plan would be six inches down from the hotface, it would not run out.  It would go down there and it would seal up.  It would—it would close up.  It would not run out.  It has to be a—it has to be a pretty thick crack for it to cause a runout.  Microscopic cracks would not—it would not cause a run out.

Q.   So a microscopic crack, as you put it, would have to get bigger and deeper, wouldn't it?

A.   It would have to go all the way through the brick.

. . .

Q.   And your testimony is that this crack would have to grow to more than six or eight inches below the surface of the—this microscopic crack would have to go below the freeze plan before there could be a runout, right?

A.   It would have to be bigger than a microscopic crack.

. . .

A.   A microscopic crack would fill with aluminum and would freeze out — freeze off.

Q.   But then again, the runout did occur?

8

A.    Absolutely.

Q.    — isn't that right? So we know that whatever crack was there did not
freeze off, isn't that right?

A.    That's correct.  It was a large void or a series of large cracks.

(*Id*. at 179-81.)

### 4.  Denny Luma, Superior's President and CEO

Denny Luma, Superior's President and Chief Executive Officer, testified that

during the run-out the molten aluminum "went through" the brick refractory hearth floor

of Furnace No. 3. (Luma Dep. at 39-40.)  He emphasized, however, that "[w]e have not

been able to determine the cause of this one." (*Id*. at 136.)

Nonetheless, on March 15, 2006, Superior submitted the following response to an

interrogatory posed by U.S. Fire:

One of the purposes of the bricks was to withstand extreme levels of heat without
cracking or deteriorating.  The bricks were also intended to prevent molten
materials from penetrating inside them.  The bricks were not fit for these and
potentially other, purposes because they may have prematurely cracked and/or
deteriorated and allowed molten aluminum to penetrate them.

(Pls.' Resps. to Interrogs. Propounded by Defs. U.S. Fire and Crum & Forster No. 11.)

### C.  Superior's Insurance Policy with U.S. Fire

On June 23, 2004, Superior made a claim for damages under its property and casualty

insurance policy issued by its insurer, U.S. Fire (the "Policy"). (Compl. ¶ 25, Exs. A-C.)  The

Policy was an "all-risk policy," subject to certain exclusions and limitations, including the

following:

2.  We will not pay for loss or damage caused by or resulting from any of
the following:

. . .

d.   (1)   Wear and tear;

     (2)   Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

     (3)   Smog;

     (4)   Settling, *cracking*, shrinking or expansion . . . .

(*Id*. CP 10 30 04 02 at 2) (emphasis added); *see also* Dep. of Dennis McCarthy at 10-11.)

### 1. Robert Carbonara, U.S. Fire's Expert

Upon receiving notice of Superior's claim, U.S. Fire retained the services of its proffered expert, Robert Carbonara, to investigate the cause of the run-out. (Carbonara's Report at 1.) Carbonara visited Superior's plant on May 5, 2004, and later issued a letter, a report, and an addendum summarizing his findings. (*Id*.; Addendum to Carbonara's Report dated January 4, 2007.)

In his documentation, Carbonara concluded:

·   The furnace run-out was caused by a loss of integrity of the furnace refractory lining.

·   The loss of integrity of the lining was the result of deteriorating refractory bricks.

·   The deteriorated bricks allowed cracks to form.

·   The cracks allowed molten aluminum to penetrate the refractory lining to the extent that a run-out occurred.

(Carbonara's Report at 5-6.) More specifically, in his deposition Carbonara opined: "The cause [of the run-out] was a hole in the floor, or a crack in the floor, however you want to refer to it, loss of integrity on the floor." (Dep. of Robert S. Carbonara, Ph.D. at 114-15.)

### 2. Charles Benson, U.S. Fire's Insurance Adjustor

On June 15, 2004, Charles Benson, U.S. Fire's insurance adjustor, attended a meeting at Superior concerning the run-out. (Dep. of Charles Benson at 107; Compl. Ex. C.) His notes from

that visit state:

> The insured & Hot Crews were adamant that furnace was of quality const. + well maintained.  That no mechanical stresses, thermal stresses or operator error occurred.  The insd, Hot Crews & R. Carbonara did eventually agree that for the bleed out to occur, a crack in the refractory, likely between the hot & cold face had to have occurred. Given that no mechanical or thermal stresses, or operator error occurred, it is believed that the crack developed in the refractory as a result of undetected deterioration.

(Benson Dep. Ex. 114.)

### 3.   U.S. Fire's Coverage Decision

U.S. Fire ultimately denied Superior's insurance claim for damages, invoking the exclusion in the Policy (set forth *supra*) for losses caused by "wear and tear." (Compl. ¶ 26, Ex. C.)

## III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.*

However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id*. at 771.

Moreover, "[g]enerally, the interpretation of an insurance policy presents a question of law and is thus appropriate for summary judgment."[7] *Morris v. Econ. Fire & Cas. Co.*, 848 N.E.2d 663, 665 (Ind. 2006).  "A contract for insurance 'is subject to the same rules of interpretation as are other contracts.'" *Id*. at 666 (quoting *USA Life One Ins. Co. of Ind. v. Nuckolls*, 682 N.E.2d 534, 537-38 (Ind. 1997)).  "If the language in the insurance policy is clear and unambiguous, then it should be given its plain and ordinary meaning, but if the language is ambiguous, the insurance contract should be strictly construed against the insurance company." *Id.* (citing *Nuckolls*, 682 N.E.2d at 538).

"This is especially true where the policy language in question concerns an exclusion clause." *Matteson v. Citizens Ins. Co. of Am.*, 844 N.E. 2nd 188, 192 (Ind. Ct. App. 2006) (quoting *Nuckolls*, 682 N.E.2d at 538). "When an insurance company fails to clearly exclude 'that which the insured attempted to protect against, we must construe the ambiguous policy to further the policy's basic purpose of indemnity.'" *Id*. (quoting *Nuckolls*, 682 N.E.2d at 538).  "A policy is ambiguous only if it is 'susceptible to more than one interpretation and reasonably intelligent persons would differ as to its meaning.'" *Id*. (quoting *Nuckolls*, 682 N.E.2d at 538).

## IV.  DISCUSSION

In its motion for summary judgment, U.S. Fire asserts that "there is no genuine issue as to the material fact that [Superior's] loss or damage was caused by or resulted from cracking."

---

[7] When sitting in diversity, the court applies the law of the state originating the controversy, "attempting to predict how the [state] Supreme Court would decide the issues presented." *Smith v. Equitable Life Assurance Soc. of the U.S.*, 67 F.3d 611, 615 (7th Cir. 1995).  The parties apparently concede that Indiana law applies.

(Defs.' Br. in Supp. of Mot. for Summ. J. at 12.)  Consequently, it contends that Superior's claim fails as a matter of law because of the exclusion in the Policy for "loss or damage caused by or resulting from cracking." (*Id*.)  Superior, however, adamantly opposes U.S. Fire's motion for summary judgment, asserting that there are genuine issues of material fact as to whether the loss was either caused by or resulted from "cracking" or whether a "crack" even existed. (Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. at 1.)  Superior's arguments are ultimately persuasive.

### A.  The Policy Issued by U.S. Fire to Superior Was an "All-Risk Policy"

Before turning to U.S. Fire's specific arguments, it is important that we first identify that the insurance policy extended by U.S. Fire to Superior is an "all-risk" policy, a fact U.S. Fire does not dispute.

An all-risk insurance policy is "a special type of insurance extending to risks not usually contemplated, and generally allows recovery for all fortuitous losses, unless the policy contains a specific exclusion expressly excluding the loss from coverage." Jane Massey Draper, *Coverage Under All-Risk Insurance*, 30 A.L.R. 5th 170, 1 (1995); *see generally Assoc. Aviation Underwriters v. George Koch Sons, Inc*., 712 N.E.2d 1071, 1073 (Ind. Ct. App. 1999) ("An 'all-risk' insurance policy extends coverage to risks not generally covered under other insurance policies."); *Ariston Airline & Catering Supply Co. v. Forbes*, 511 A.2d 1278, 1282 (N.J. 1986). Thus, once Superior establishes a fortuitous loss, it is entitled to recover under the Policy, *unless* U.S. Fire proves that the material risk from which the loss arose was excluded from coverage. Draper, *supra* at 45; *see also In re Balfour MacLaine Int'l, Ltd.*, 85 F.3d 68, 77-78 (2nd Cir. 1996*)*; *Associated Aviation*, 712 N.E.2d at 1073.

Fortuitous losses are losses that are "unexpected and not probable" or "dependent upon

chance, as far as the parties were aware." Draper, *supra* at 45, 55; *see also Ariston Airline*, 511 A.2d at 1282; *Schultz v. Erie Ins. Group*, 754 N.E.2d 971, 974 (Ind. Ct. App. 2001).  Thus, any event that was inevitable under the circumstances would not be considered fortuitous. Draper, *supra* at 45.  A plaintiff's burden to demonstrate fortuity is "not a particularly onerous" showing. *Id.* at 54-55.  In fact, in doing so, a plaintiff is not required to show a precise cause of loss. *Balfour MacLaine*, 85 F.3d at 77-78; *Harbor House Condo. Ass'n v. Mass. Bay Ins. Co.*, 703 F. Supp. 1313, 1317 (N.D. Ill. 1988) ("Unlike a plaintiff who asserts a loss under a 'specific risk' policy, a plaintiff claiming damage under an 'all risk' policy need not prove the exact cause of his damage."); Lee R. Russ & Thomas F. Segalla, 7 Couch on Ins. § 101:7 (3d. ed. 1997); Draper, *supra* at 54-55.  Here, U.S. Fire apparently concedes, at least for purposes of the present motion, that Superior's loss was fortuitous.

Indeed, U.S. Fire's sole basis for summary judgment is that Superior's loss is barred under the "cracking exclusion" in the Policy.  As a result, U.S. Fire bears the burden of showing that its express "cracking exclusion" applies. *See* Draper, *supra* at 54; *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 151 (7th Cir. 1994) ("If an insurer relies on an exclusion within a policy to deny coverage, the insurer must establish that the exclusion applies.").

### B.  A Genuine Issue of Material Fact Exists as to Whether the Loss Was "Caused By or Resulted From . . . Cracking"

As explained *supra*, U.S. Fire contends that no dispute of material fact exists with respect to whether Superior's loss was "caused by or resulted from . . . . cracking."  Specifically, U.S. Fire's expert witness, Carbonara, contends that "cracks allowed molten aluminum to penetrate the refractory lining to the extent that a run-out occurred." (Carbonara's Report at 6.)

The term "crack," or "cracking," is not defined in the Policy, though the Policy's use of such language is clear and unambiguous. (Compl. Ex. A, CP 10 30 04 02 at 2 ("We will not pay for loss or damage caused by or resulting from . . . [s]ettling, cracking, shrinking or expansion . . . .")); *see Morris*, 848 N.E.2d at 666.  Consequently, the term "should be given [its] plain and ordinary meaning." *Monticello Ins. Co. v. Mike's Speedway Lounge, Inc.*, 949 F. Supp. 694, 699 (S.D. Ind. 1996) (citing *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992)).  Dictionary definitions typically supply the plain and ordinary meaning of language. *See, e.g.*, *OmniSource Corp. v. NCM Ams., Inc.*, 313 F. Supp. 2d 880, 891 (N.D. Ind. 2004); *Smith v. Allstate Ins. Co.*, 681 N.E.2d 220, 223 (Ind. Ct. App. 1997).  The Merriam-Webster Dictionary defines "crack" when used as a verb as "to break, split, or snap apart," and when used as a noun as "a narrow break," a "fissure," a "narrow opening," or "a weakness or flaw caused by decay, age, or deficiency." Merriam-Webster OnLine, http://www.m-w.com/dictionary (last visited June 18, 2007); *see also* The American Heritage Dictionary 202 (3rd ed. 1994).

U.S. Fire is indeed correct that *some* of Superior's witnesses referred to a "crack" or "cracking" when describing the events pertaining to the run-out.  For example, Monks stated that "[s]omething would have had to have cracked and opened up," and Davis at one point in his deposition stated that "[i]t was a large void or a series of large cracks." (Monks Dep. at 125; Davis Dep. at 181.)  Indeed, even in its answer to one of U.S. Fire's interrogatories Superior stated: "The bricks . . . may have prematurely cracked and/or deteriorated and allowed molten aluminum to penetrate them." (Pls.' Resps. to Interrogs. Propounded by U.S. Fire No. 11.)

However, Davis also stated throughout his deposition that the run-out was caused by a "sudden heaving of the middle of the floor." (Davis Dep. at 168.)  Clearly, a "sudden heaving of

15

the floor" is distinguishable from the definition of "crack," as the term "heave" means "to elevate"; "lift, raise"; "throw, cast"; "to cause to swell or rise"; or to "displace." Merriam-Webster OnLine, http://www.m-w.com/dictionary (last visited June 18, 2007); *see also* The American Heritage Dictionary 388 (3rd ed. 1994).  Moreover, Davis contends that this "heaving" of the brick refractory floor *created* cracks, characterizing the run-out as a "sudden and catastrophic event." (Davis Dep. at 168, 190.)  Indeed, the "sudden and catastrophic" nature of the event and the use of descriptive terms by various witnesses for the aftermath, such as "large void" and "hole," including U.S. Fire's own expert (*see* Davis Dep. at 181; Carbonara Dep. at 114-15), at least raise a reasonable inference that the loss falls outside the scope of the plain and ordinary meaning of "crack." *See*, *e.g.*, *Louisville Coll. of Dentistry v. Hartford Steam Boiler Inspection & Ins. Co.*, 215 S.W. 941 (Ky. 1919) (concluding in an insurance coverage dispute concerning a damaged steam boiler that an irregular semicircular break or opening about fifteen inches long in a casting on the front of a boiler was a "rupture" rather than a "crack").

Of course, although U.S. Fire contends that deteriorating refractory bricks allowed cracks to form, this overlooks the fact that Furnace No. 3 was thoroughly inspected just three months before the run-out by Hot Crews, its refractory-lining specialist, with no cracks or open joints observed and the refractory bricks noted to be in good condition.  Likewise, Davis testified that signs of deterioration were not detected upon inspection after the run-out. (Davis Dep. at Ex. 30 ("[T]he indicators that would be present if the failure were due to a lack of maintenance, abuse, poor operating procedures or normal wear and tear, (such as spalling, excess/large amounts of metal between the subfloor and the hotface brick, or other signs of deterioration) were not present during the cold-clean in December 2003 nor during the inspection after the run-out.").)

16

This evidence clearly contradicts U.S. Fire's causation theory and at least raises a reasonable inference that the run-out did not result from cracking as a result of deterioration. *See generally Churchill v. Factory Mut. Ins. Co.*, 234 F. Supp. 2d 1182, 1186-87 (W.D. Wash. 2002).

Furthermore, Superior emphasizes that even if "cracking" did occur as a result of the run-out, it is only relevant if it is a causative factor in the loss. *See Associated Aviation*, 712 N.E.2d at 1076. Indeed, for the cracking exclusion to apply, U.S. Fire must show that Superior's loss was *caused by* or *resulted from* cracking, not merely that cracking occurred *during* Superior's loss. *See generally Ariston Airline*, 511 A.2d at 1286 (distinguishing between "bulging" resulting from the application of some external force or unusual event from "cracking" due to the natural and expected settling of a building). Specifically, Superior points to Davis's testimony that a "sudden heaving" of the middle of the floor *created* cracks and, furthermore, that the sudden heaving of the floor "was due to a sudden and catastrophic event with the exact cause of the failure being undeterminable." (Davis Dep. at 168-69, 190; *see also* Luma Dep. at 136 ("We have not been able to determine the cause of this one.").)

When arguing this distinction, Superior cites the "efficient proximate cause" doctrine, which was recently adopted by the Indiana Court of Appeals in *Hartford Casualty Co. v. Evansville Vanderburgh, Public Library*, 860 N.E.2d 636, 645-47 (Ind. Ct. App. 2007), an all-risk insurance case involving a building collapse. *Id.* at 647 ("We are persuaded by the analysis and reasoning of efficient proximate cause in the interpretation and construction in policy language and believe that it serves the end of understandable and predictable coverage in the policy at issue here and all-risk policies, in general."). Under the doctrine, the exclusion will not apply if the cracking was merely an *effect*, as opposed to the *cause*, of the loss. *Associated*

17

*Aviation*, 712 N.E.2d at 1076.

> More particularly, the efficient proximate cause doctrine provides:
>
> [W]here a peril specifically insured against sets other causes into motion which, in an unbroken sequence, produce the result for which recovery is sought, the loss is covered, even though other events within the chain of causation are excluded from coverage.  Stated in another fashion, where an insured risk itself sets into operation a chain of causation in which the last step may have been an excepted risk, the excepted risk will not defeat recovery.

*Id.* at 646 (internal quotation marks omitted).  Thus, "[t]he application of the efficient proximate cause doctrine requires that at least two causes combine to create the property loss – one covered under the insurance policy and one excluded under the insurance policy." *Burgess v. Allstate Ins. Co.*, 334 F. Supp. 2d 1351, 1360 (N.D. Ga. 2003); *Sunbreaker Condo. Ass'n v. Travelers Ins. Co.*, 901 P.2d 1079, 1083 (Wash. Ct. App. 1995); *see generally Crete-Monee Sch. Dist. v. Ind. Ins. Co.*, No. 96 C 0275, 2000 WL 1222155, at *8 (N.D. Ill. Aug. 22, 2000) ("The [efficient proximate cause] doctrine attempts to strike a balance between, on the one hand, the temptation to convert an all-risk policy into an 'all-loss' policy by allowing recovery anytime an insured can point to a covered circumstance that contributed to the loss and, on the other hand, the temptation to convert an all-risk policy into a 'no-risk' policy by excluding coverage anytime an insurer can point to an excluded risk as a contributing factor in the chain of causation.").

Apparently, Superior contends that the "sudden heaving" of the floor, or the fortuitous event of "undeterminable" origin that caused the "sudden heaving," constitutes the "covered peril" under the Policy, while any purported "cracking" of the brick refractory floor, such as in U.S. Fire's scenario, constitutes the "excluded peril."  Though the Court could not find a case on point in which the doctrine was extended to instances where the loss was of undeterminable origin, it is clear that "all risk" insurance policies do cover such events, in that  "[i]n an all-risk .

18

. . insurance policy, any peril that is not *specifically excluded* in the policy is an insured peril."
*Findlay v. United Pac. Ins. Co.*, 917 P.2d 116, 121 (Wash. 1996); *N. Coast Enters. v. St. Paul
Fire & Marine Ins. Co.*, No. C05-653L, 2006 WL 851707, at *2 (W.D. Wash. Mar. 28, 2006);
*see also Harbor House*, 703 F. Supp. at 1317 ("Unlike a plaintiff who asserts a loss under a
'specific risk' policy, a plaintiff claiming damage under an 'all risk' policy need not prove the
exact cause of his damage."); *see generally Churchill*, 234 F. Supp. 2d at 1189 (collecting cases).
Indeed, "all risks insurance arose for the very purpose of protecting the insured in those cases
where difficulties of logical explanation or some mystery surround the (loss of or damage to)
property." *Morrison Grain Co. v. Utica Mut. Ins.* Co., 632 F.2d 424, 430 (5th Cir. 1980).

Ultimately, of course, the Court need not reach the question of whether an
undeterminable loss is a "covered peril" for purposes of applying the efficient proximate cause
doctrine because U.S. Fire did not move for summary judgment on the premise that a loss of
undeterminable origin is excluded under the Policy.  Rather, U.S. Fire moved for summary
judgment solely under the "cracking exclusion," and thus it is U.S. Fire's burden to establish that
no material dispute exists as to whether the run-out was caused by "cracking." *See Peters Twp.
Sch. Dist. v. Hartford Accident & Indem. Co.*, 833 F.2d 32, 37 (3rd Cir. 1987) (emphasizing that
the "ultimate issue" in a motion for summary judgment involving an "all risk" insurance policy
is whether the defendant sustained its burden of proof that the loss at issue fell within the scope
of the proffered insurance exclusion); *see generally S. Ins. Co. v. Domino of Cal., Inc.*, 173 Cal.
App. 3d 619, 625 (Cal. Ct. App. 1985) ("[I]n an action upon an all-risks policy . . . the insured
does not have to prove that the peril proximately causing his loss was covered by the policy.").
On this record, U.S. Fire has failed to carry its burden given that there is a reasonable inference

that the run-out was caused by something other than "cracking" or that any alleged "cracking" was merely a circumstance, rather than a cause, of the loss. *Peters*, 833 F.2d at 38.

The over-arching principle at work here is that "[i]n insurance cases in which causation is disputed, and the causal factors will determine whether or not coverage is required, courts routinely refer the matter to the jury." *Eichacker v. Paul Revere Life Ins. Co.*, 354 F.3d 1142, 1147 (9th Cir. 2004); *see also Mosaic Law Congregation v. Amco Ins. Co.,* No. CIV. S-05-2293 FCD/KMJ, 2007 WL 763359, at *4 (E.D. Cal. Mar. 9, 2007); *Churchill*, 234 F. Supp. 2d at 1186-87 ("As a general rule, the determination of efficient proximate cause of a loss is a question of fact for the factfinder, unless the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion.").  On this record, reasonable persons could draw different conclusions about the proximate cause or efficient proximate cause of the run-out, and thus a material factual dispute concerning causation exists necessary for a jury to determine. *See N. Coast Enters.*, 2006 WL 851707, at *4; *Churchill*, 234 F. Supp. 2d at 1186-87; *Chlor Alkali Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 863 F. Supp. 1226, 1232 (D. Nev. 1994); Russ, *supra* at § 101:59.

Consequently, since the Court cannot resolve the question of coverage on summary judgment, U.S. Fire's motion will be denied. *See generally Chlor Alkali*, 863 F. Supp. at 1232.

### C.  Summary Judgment Will Be Granted with Respect to Crum & Forster

Finally, Crum & Forster argues that it is entitled to judgment as a matter of law because it did not issue the Policy to Superior. (Defs.' Br. in Supp. of Mot. for Summ. J. at 12-13.)  Indeed, the Policy states on its face that it was issued by U.S. Fire. (Compl. Ex. A, FM 206.0.11.) Superior did not respond to this argument upon summary judgment; thus, it is deemed to have

abandoned its claims against Crum & Forster, and summary judgment will be entered in favor of Crum & Forster. *See*, *e.g*., *Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that arguments not presented to the court in a response to a motion for summary judgment are deemed waived).

## V. CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (Docket # 67) filed by U.S. Fire and Crum & Forster is DENIED as to U.S. Fire, but is GRANTED with respect to Crum & Forster.

SO ORDERED.

Enter for the 25th day of June, 2007.

<u>S/Roger B. Cosbey</u>
Roger B. Cosbey,
United States Magistrate Judge

21